**MOTOR CITY BAGELS, L.L.C., et al., Plaintiffs,**

v.

**The AMERICAN BAGEL COMPANY, et al., Defendants.**

**No. Civ. S–97–3474.**

United States District Court, D. Maryland.

June 7, 1999.

Thomas J. Minton, Quinn, Ward and Kershaw, Baltimore, MD, John Thomas Ward, Ward, Kershaw and Minton, P.A., Baltimore, MD, for Randall S. Flinn, plaintiff.

Peter J. Kadzik, Dickstein, Shapiro & Morin, L.L.P., Washington, DC, for The American Bagel Company, Alan Manstof, Michael Robinson, defendants.

James Allen Kaffenbarger, Jr., Budow and Noble, Bethesda, MD, Roberta R. Wilson, Doepken Keevican & Weiss, P.C., PH, Pittsburgh, PA, for Dan Rowe, a Virginia resident, defendant.

Christine Ella Connelly, Wiley, Rein and Fielding, Washington, DC, James C. Ru-

binger, Wiley, Rein & Fielding, PH, Washington, DC, David A. Huberman, Wiley, Rein & Fielding, PH, Washington, DC, for AFC Enterprises, Inc., defendant.

Thomas J. Minton, Quinn, Ward and Kershaw, Baltimore, MD, John Thomas Ward, Ward, Kershaw and Minton, P.A., Baltimore, MD, for Randall S. Flinn, counter-defendant.

## MEMORANDUM AND ORDER

SMALKIN, District Judge.

This case is before the Court on the following motions: (1) Motion for Summary Judgment by Defendants, American Bagel Company, Alan Manstof, and Michael Robinson; (2) Motion for Summary Judgment by Defendant, Dan Rowe; (3) Motion for Summary Judgment by Defendant/Counterclaim–Plaintiff, AFC Enterprises, Inc.; and (4) Cross Motion for Partial Summary Judgment by Plaintiffs/Counterclaim–Defendants, Joe Anthony, Randall Flinn, and Motor City Bagels L.L.C. The issues pertinent to the disposition of these motions have been fully briefed, and no oral hearing is necessary. Local Rule 105.6 (D.Md.).

### I. Background

Beginning in the fall of 1993, Plaintiff, Joseph Anthony, began researching franchise opportunities as a possible entrepreneurial venture. At that time, Mr. Anthony had an M.B.A. in finance and accounting from the Tuck School of Business Administration at Dartmouth College and had extensive experience in commercial real estate investment and management. By the spring of 1994, Mr. Anthony intensified his evaluation of potential franchise opportunities, focusing particularly on the bagel industry. While researching various bagel franchisors, Mr. Anthony initiated discussions with Chesapeake Bagel Bakery through its sales representative Steve Vierra.[1] After some

---

1. At that time, Mr. Vierra worked for Restaurant Development Company ("RDC"). RDC, which was owned and operated by Defendant, Dan Rowe, had been retained by The Ameri- can Bagel Company, the franchisor of Chesapeake Bagel Bakery restaurants, to handle franchise sales outside of the Washington, D.C. metropolitan area.

preliminary discussions on the telephone, Mr. Anthony traveled to McLean, Virginia during the spring of 1994 to meet with Mr. Vierra and to tour a handful of Chesapeake stores in the Washington, D.C. area.

Early in the summer of 1994, Plaintiff, Randall Flinn, teamed with Mr. Anthony in assessing the feasibility of operating a bagel franchise. Mr. Flinn, a friend of Mr. Anthony's from college, had an M.B.A. from the J.C. Kellogg Graduate School of Management and was working as a Senior Product Manager for Teradyne, an Illinois telecommunications concern. By late July 1994, Mr. Anthony and Mr. Flinn received an American Bagel Uniform Franchise Offering Circular, dated August 23, 1993 ("1993 UFOC"), which disclosed information about the Chesapeake Bagel Bakery franchise system, including estimates of initial investment costs experienced by franchisees.

The 1993 UFOC provided an estimate for initial investment costs for Chesapeake Bagel Bakeries, "based on the latest available data," ranging from $240,400 to $304,500. 1993 UFOC at 8. Mr. Anthony and Mr. Flinn used the cost figures provided in the 1993 UFOC as a central assumption in an extensive, written business plan analyzing the viability of owning and operating Chesapeake Bagel Bakery franchises. The plaintiffs used the midpoint in the range provided in the disclosure document, $275,000, to determine the amount of capital required to open an individual store.

Although the plaintiffs used the cost figures from the August 23, 1993 UFOC in drawing up their business plan, American Bagel had actually updated its disclosure information through a revised UFOC, filed in Mr. Anthony's home state of Indiana on April 21, 1994 ("1994 UFOC"). This revised UFOC contained a higher range of estimated initial investment costs than was included in the 1993 UFOC. The 1994 UFOC stated that, "based on the latest available data," start-up costs for individual Chesapeake Bagel Bakery stores ranged between $288,300 and $376,000.

In November 1994, American Bagel mailed Mr. Anthony a second UFOC. The defendants contend that they sent the 1994 UFOC with the revised estimates of initial investment costs. The plaintiffs, however, vehemently deny this assertion, claiming that they received a UFOC with the same cost estimates that they had received in July. In any event, Plaintiffs, Mr. Anthony, Mr. Flinn, and Motor City Bagels, L.L.C., signed an Area Franchise Development Agreement ("AFDA") on December 3, 1994 pursuant to which they received the exclusive right, subject to certain terms and conditions, to develop Chesapeake Bagel Bakeries in Oakland County, Macomb County, and the city of Grosse Pointe, Michigan. Under the agreement, the plaintiffs had to pay $25,000 at the time of signing, $10,000 prior to December 31, 1994, and an additional $50,000 within forty-five days. That same day, the plaintiffs also entered into two franchise agreements, obligating the plaintiffs to pay license fees of $22,500 and $20,000 by December 31, 1994.

On June 15, 1995, the plaintiffs signed another AFDA pursuant to which they were granted, under certain terms and conditions, the exclusive right to develop Chesapeake Bagel Bakeries in Washtenaw, Livingston, Clinton, Eaton, and Ingham Counties, Michigan, another franchise agreement, and a promissory note for $10,000 payable to American Bagel. Under the AFDA, the plaintiffs paid to American Bagel $60,000 in franchise fees and the franchise agreement required the plaintiffs to pay an additional $17,500 in license fees.

Allegedly unbeknownst to the plaintiffs, American Bagel had again updated its UFOC between the signing of the first wave of agreements on December 3, 1994, and the second wave on June 15, 1995. On January 25, 1995, the Federal Trade Commission approved the revised offering circular submitted by American Bagel ("1995 UFOC"). In this updated disclosure form, American Bagel had again increased the estimated initial costs that prospective

franchisees could expect to spend to a range of $328,800 to $431,000.

Pursuant to the two franchise agreements signed on December 3, 1994, the plaintiffs opened a Chesapeake Bagel Bakery on December 27, 1995 in Northville, Michigan, and a second one in Troy, Michigan on March 6, 1996.[2] According to the plaintiffs, their start-up costs greatly exceeded the amounts represented by the defendants in the 1993 UFOC. Mr. Anthony estimated that in the Northville store, the plaintiffs spent $425,000 on tenant improvements and equipment, and that franchise fees and expenses associated with training, advertising, and deposits pushed the total cost of the store over $500,000. Similarly, the plaintiffs assert that it cost approximately $400,000 to construct and equip the Troy store, even before accounting for franchise fees, advertising, training, and other sundry start-up expenses.

After Northville and Troy, the plaintiffs failed to open up any additional Chesapeake Bagel Bakery restaurants as required by the Consolidated, Amended and Restated Area Development Agreement, signed by the plaintiffs on August 10, 1996.[3] Mr. Flinn testified at his deposition that the plaintiffs refused to open more stores because they had "been fraudulently induced into signing the contracts and the agreement with [American Bagel] to open these stores through the representation of construction costs that were dramatically lower than the actual costs." Flinn Dep. at 196. The plaintiffs had exhausted their capital in starting up the Northville and Troy restaurants, and the debt burden resulting from the unexpectedly high construction costs was "putting a real strain on the profitability of the stores." *Id.* at 25. Mr. Flinn explained that "at $400,000 to open a store, it's not a viable business. So, yes, we said if it's going to cost us $400,000 to open stores, we are not going to be able to open any additional stores." *Id.* at 26–27. In addition to not constructing additional stores, the plaintiffs, in November 1996, likewise decided to stop paying various monthly franchise fees to American Bagel and its successor, Defendant, AFC Enterprises, Inc. ("AFC"), arising from the ongoing operations at their Northville and Troy stores.[4]

As a result of this failed business relationship, the plaintiffs filed an eight-count suit against the defendants alleging violations of Indiana franchise law, fraud, negligent misrepresentation, violations of Maryland franchise law, breach of contract, unjust enrichment, and misappropriation of trade secrets. In addition, the plaintiffs seek declaratory judgment against AFC, arguing that the contracts at issue in this case are void *ab initio* and thus unenforceable. Additional facts will be discussed, as needed, within the framework of the legal issues presented in the individual claims.

## II. Standard for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded

---

2. The plaintiffs never opened a store under the June 15, 1995 Franchise Agreement.

3. This agreement replaced the earlier AFDA's signed by the parties on December 3, 1994 and June 15, 1995.

4. AFC acquired the Chesapeake system from American Bagel in May 1997.

jury could return a verdict for the [non-moving party] on the evidence presented." *Id.* at 252, 106 S.Ct. 2505. In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### III. Indiana Franchise Act

The Supreme Court of Indiana has held that a private cause of action under the Indiana Franchise Act ("IFA") arises where a party claims "violations of the anti-fraud provision of the [IFA]." *Continental Basketball Ass'n, Inc. v. Ellenstein Enters., Inc.*, 669 N.E.2d 134, 137 (Ind. 1996).[5] The anti-fraud provision, found in section 27 of the IFA, states that

> It is unlawful for any person in connection with the offer, sale or purchase of any franchise . . .: (1) to employ any device, scheme or artifice to defraud; (2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or (3) to engage in any act which operates or would operate as fraud or deceit upon any person.

Ind.Code § 23–2–2.5–27.

In *Enservco, Inc. v. Indiana Sec. Div.*, 623 N.E.2d 416, 423 (Ind.1993), the Supreme Court of Indiana discussed the "level of culpability one must show, if any, in respect to the misrepresentation or omission to prove a violation" of section 27. The court stated that "[s]ection 27(1)'s proscription is aimed at one who pursues a

course of conduct with the knowledge or expectation that it will defraud another person." *Id.* The court thus concluded that "[t]o prove section 27(1) franchise fraud, one must show the alleged violator employed a 'device, scheme or artifice' with the *knowledge or intent* that it might defraud another." *Id.* (emphasis added). By contrast, the *Enservco* court observed that "[f]or instances of franchise fraud falling into section 27(2) and (3), . . . the legislature has used words whose common understanding does not convey a requirement of scienter, or indeed any measure of culpability at all." *Id.* The court noted that "[s]ection 27(2) and (3) each prohibit conduct by referring to the nature of the conduct or to its effect, rather than by focusing on the mind of the violator. Subsection (2) proscribes material, untrue statements or omissions; subsection (3) prohibits any act which has the effect of operating as a fraud or deceit upon any person." *Id.*

Thus, after a thorough analysis of the statutory language, the *Enservco* court held that plaintiffs bringing claims under section 27(1) of the IFA must prove scienter, i.e., that the defendant knowingly or intentionally defrauded another. However, "the absence of language in section 27(2) and (3) bearing on mental state suggests the legislature intended that these subsections should operate as strict liability provisions." *Id.* In most cases, a plaintiff simply must prove three elements to succeed on a private cause of action under section 27(2) and (3) of the IFA: (1) a false statement or omission; (2) materiality;[6] and (3) harm caused by reliance on the statement or omission.[7] *Id.* at 425.

---

**5.** The IFA applies in this case because Plaintiff, Joe Anthony, was a resident of Indiana at the time he entered into the franchise agreements with American Bagel. Ind.Code § 23–2–2.5–2(a).

**6.** The Supreme Court of Indiana noted that a fact "is material if . . . there is a substantial likelihood that a reasonable investor would have viewed the information as having significantly altered the total mix of available infor-

mation." *Enservco*, 623 N.E.2d at 423 (internal quotations omitted).

**7.** The Seventh Circuit has concluded that a plaintiff prosecuting a private cause of action under the IFA must demonstrate "reasonable reliance" on alleged misstatements of fact. *Hardee's of Maumelle, Ark., Inc. v. Hardee's Food Sys., Inc.*, 31 F.3d 573, 579 (7th Cir. 1994).

In asserting claims under the IFA, the plaintiffs contend that the defendants made false representations regarding both initial investment costs and average annual store sales in the Chesapeake Bagel Bakery system. Compl. ¶ 46. The Court will address the issues pertaining to the start-up costs first as the facts relevant to this claim have been set forth above at length.

### A. Representations of Initial Investment Costs

#### 1. The 1994 Agreements

■ The 1993 UFOC, first sent to the plaintiffs in July 1994, provided an estimate, "based on the latest available data," of initial investment expenses for Chesapeake franchisees ranging from $240,400 to $304,500. Significantly, Defendant, American Bagel, had filed the updated 1994 UFOC with the State of Indiana three months prior, on April 21, 1994. The 1994 UFOC showed that initial investment cost estimates for Chesapeake Bagel Bakery franchisees had jumped to between $288,300 and $376,000. The plaintiffs contend that they never received a copy of the 1994 UFOC. They assert that the defendants mailed them yet another copy of the 1993 UFOC in November 1994, ten days before the plaintiffs signed the first franchise agreements. The defendants counter that the circumstantial evidence demonstrates, as a matter of law, that the plaintiffs did, in fact, receive the updated UFOC in November 1994.

Although the defendants cannot produce a copy of the UFOC that they mailed to the plaintiffs in November 1994, they did retain in their records the Acknowledgment of Receipt by Prospective Franchisee form signed by Joseph Anthony on November 21, 1994. This acknowledgment form shows that the UFOC received by the plaintiffs on November 21, 1994 included American Bagel Company's financial statements as of December 31, 1993 as one of its exhibits. The defendants contend that the 1993 UFOC, filed in August of 1993, could not possibly have included American Bagel's financial statements covering the entirety of that year. By comparison, the defendants argue that Acknowledgment of Receipt by Prospective Franchisee signed by Mr. Anthony on July 26, 1994, sent along with a copy of the 1993 UFOC, only included financial statements through June 30, 1993.

Although this evidence may support the defendant's contention that they sent the 1994 UFOC in November 1994, the Court cannot make such a finding as a matter of law. As the plaintiffs point out in their reply brief, the "acknowledgment does not show the effective date of the UFOC to which it was attached, nor does it identify the total of the franchisees' initial investment which was contained in the UFOC." Pltf. Reply to American Bagel at 9. In ruling on the defendants' motion for summary judgment, "[t]he facts and inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party, and this party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is disputed accepted, and all internal conflicts in it resolved favorably to him." *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (internal quotations and alterations omitted). Based on this standard, the Court therefore will assume that the plaintiffs never received the 1994 UFOC with updated information on the initial investment costs in the Chesapeake system.

Assuming that the plaintiffs never received the 1994 UFOC, and the revised initial investment cost estimates included therein, a rational jury could find that the plaintiffs have a valid cause of action under section 27(2) and (3) of the IFA. First, the initial investment costs provided in the 1993 UFOC would constitute a false statement as they would not have been based "on the latest available data." In addition, the representation of the cost figures in the disclosure document would be actionable as "they did not accurately reflect past or present circumstances." *Commercial Property Invs., Inc. v. Quality Inns Intl., Inc.*, 938 F.2d 870, 876 (8th Cir.1991).

Second, this information is unquestionably material as it would significantly alter the total mix of information available to a prospective franchisee. A comparison of the initial investment costs reported in the 1993 UFOC with the figures listed in the 1994 UFOC shows a nearly twenty percent increase at the low end of the range (from $240,400 to $288,300) and a twenty-three percent rise at the high end (from $304,500 to $376,000). Indeed, in the case at bar, the initial investment cost constituted a central assumption in the plaintiffs' business plan and changes in this variable clearly have a dramatic impact on the profitability of such enterprises.

Third, the plaintiffs could demonstrate that they were harmed by reliance on the defendants' misrepresentations as they arguably would not have entered into the various contractual obligations with American Bagel had the defendants disclosed the higher initial investment cost estimates. Moreover, the plaintiffs could argue that their reliance was reasonable as the franchisors disclosed this information to aid potential franchisees assess the merits of a Chesapeake Bagel Bakery as a business opportunity. *See* David J. Kaufman, *An Introduction to Franchising and Franchise Law, in* Franchising 1992 Business and Legal Issues, at 55–56 (PLI Commercial L. and Practice Course Handbook Series No. A4–4367, 1992) ("A franchisor's UFOC is designed to furnish to prospective franchisees all of the information necessary for them to make informed investment decisions.").

The defendants argue that they furnished the plaintiffs with a franchise brochure showing higher start-up costs than those found in the 1993 UFOC at a meeting in October 1994. This fact, however, does not, as a matter of law, preclude reasonable reliance on the official disclosure statements given to the plaintiffs in July and November of 1994. At the very least, whether the plaintiffs could reason-ably rely on the cost figures provided in the UFOC's is a factual issue for the jury.

The defendants likewise assert that the plaintiffs' reliance on the cost estimates in the UFOC was unreasonable as a matter of law, because representatives of both American Bagel and RDC had warned Mr. Anthony and Mr. Flinn that their costs would increase if they built a large or extravagant store. It is not clear from the record, however, that the plaintiffs, in fact, built a large and expensive store in either Northville or Troy. Again, such a finding would be factual in nature and is, therefore, appropriate for a jury. Thus, considering the facts presented to the Court, and the reasonable inferences to be drawn therefrom, a rational jury could find in favor of the plaintiffs under section 27(2) and (3) of the IFA.

■ The plaintiffs also have alleged that the defendants violated section 27(1) of the IFA by knowingly and intentionally misstating the initial investment costs that the plaintiffs could expect to incur in establishing a Chesapeake franchise. Unlike their claims under section 27(2) and (3), the plaintiffs would have to prove through circumstantial evidence that the defendants possessed the requisite scienter to maintain a cause of action under section 27(1). The element of scienter in this case, as in most, would have to be proved by circumstantial evidence.[8] In the instant case, the plaintiffs could show that they clearly were concerned about the start-up costs that they would face as Chesapeake franchisees and asked the defendants to confirm the figures reported in the 1993 UFOC on numerous occasions. According to the plaintiffs' allegations, the defendants did verify the initial investment costs that were contained in the 1993 UFOC despite the fact that their later UFOC's demonstrated that start-up costs had increased appreciably. Thus, viewing the record in the light most favorable to the plaintiffs,

---

8. *See* In re *Vincent,* 268 Ind. 101, 374 N.E.2d 40, 43 (1978) ("Intent to defraud may be presumed from circumstantial evidence.").

the Court concludes that there is a triable issue with regard to whether the defendants employed a device, scheme or artifice to defraud the plaintiffs under section 27(1) of the IFA.

While the facts taken in the light most favorable to the plaintiffs preclude the defendants' motions for summary judgment based on the misrepresentation of start-up costs, the plaintiffs' cross motion for summary judgment on this issue must likewise be denied. There is a factual dispute as to whether the plaintiffs actually received the 1994 UFOC prior to signing the franchise agreements and AFDA on December 3, 1994. Considering the record in the light most favorable to the defendants, there is evidence that they did in fact send the 1994 UFOC to the plaintiffs in November 1994, based on the acknowledgment of receipt from signed by Mr. Anthony. Assuming that the plaintiffs did obtain the revised UFOC prior to signing the December 1994 agreements, their reliance on lower start-up cost estimates would have been unreasonable as a matter of law. A determination of this issue hinges on a factual finding appropriate for a jury.

### 2. The 1995 Agreements

The defendants again revised the UFOC for prospective Chesapeake Bagel Bakery franchisees in January 1995. Despite that fact, the plaintiffs contend that this updated disclosure document was not submitted for their review prior to signing the additional franchise agreement and the AFDA in June 1995. The plaintiffs continued to operate under the assumption that the 1993 UFOC was still in effect.

Taking the facts in the light most favorable to the plaintiffs, the defendants failed to notify Mr. Anthony and Mr. Flinn that the initial investment cost estimates had been revised and that the figures provided in the 1993 UFOC were no longer based on the latest available data. This constituted an omission of a material fact upon which the plaintiffs reasonably relied, thereby suffering damages. Under the analysis outlined above, the plaintiffs have generated a triable issue and will, there-

fore, be permitted to present their IFA claim, as it relates to the 1995 Agreements, to a jury. Accordingly, the defendants' motions for summary judgment on this point are denied.

As above, the Court also denies the plaintiffs' cross-motion for summary judgment on their claims relating to the agreements signed in June 1995. Viewing the record in the light most favorable to the defendants, the plaintiffs received the 1994 UFOC in November 1994. Under this assumption, the plaintiffs were on notice of the increased start-up costs contained in that document. Thus, the plaintiffs could hardly assert that they reasonably relied on the cost figures in the 1993 UFOC when they entered into the franchise agreement and AFDA in June 1995.

### B. Representations of Average Store Sales

The plaintiffs contend that the defendants likewise misrepresented the average store sales of franchisees in the Chesapeake Bagel Bakery system. Defendants, American Bagel, Mr. Rowe, and Mr. Manstof, allegedly stated, on numerous occasions, that average annual store sales were $780,000 and that six Chesapeake restaurants had annual sales of over $1 million. As a result of the defendants' representations, the plaintiffs incorporated this information into their business plan.

While the parties vigorously dispute the veracity of the defendants' statements, the Court need not decide that issue to dispose of the plaintiffs' claim. Instead, the Court concludes that the statements about average store sales are not actionable as a matter of law, because the plaintiffs could not have reasonably relied on these assertions.

First, the franchise agreements which the plaintiffs signed in both December of 1994 and June of 1995 contain an integration clause which states that "[t]his Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous oral or written agreements or understandings of

**472**

the parties." December 3, 1994 Franchise Agreement ¶ 31 at 24; June 15, 1995 Franchise Agreement ¶ 30 at 28. In *Hardee's of Maumelle, Ark., Inc.*, the court, applying the IFA, determined that reliance on oral representations by a licensee was unreasonable as a matter of law where the licensing agreement contained an integration clause. 31 F.3d at 576. The Seventh Circuit found that "[t]he district court properly concluded, 'it is simply unreasonable to continue to rely on representations after stating in writing that you are not so relying.' " *Id.*

In addition, the 1993 UFOC, which the plaintiffs read and have heavily relied on in bringing their claims for misrepresentations as to initial investment costs, states:

> The franchisor is unable to provide actual, average, projected or forecasted sales, profits or earnings because its experience has been limited, and sales levels and profits are expected to vary depending upon the location of each particular Chesapeake Bagel Bakery. Therefore, the American Bagel Company makes no representations or projections regarding franchise sales, profits or earnings. The franchisor further states that there is no agent, officer or other representative of the franchisor who is authorized to make any sales, profit or earnings projections on behalf of the franchisor relating to the operation of a Chesapeake Bagel Bakery franchise.

1993 UFOC ¶ 19 at 26–27. The United States District Court for the District of Minnesota has concluded that a party cannot reasonably rely on allegedly fraudulent representations of sales revenues of other franchisees where such representations are directly contradicted by the terms of an applicable offering statement. *Carlock v. Pillsbury Co.*, 719 F.Supp. 791, 829 (D.Minn.1989). *See also Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146, 1152 (S.D.N.Y.1989) (holding that franchisee's reliance on alleged misstatements by defendants was unreasonable as a matter of law where "[t]he franchise agreement, as well as the offering circular which preced-

ed it, both contained detailed, explicit integration and disclaimer clauses" similar to those in the case at bar).

Considering the experience and sophistication of Mr. Anthony and Mr. Flinn, their representation by counsel in negotiating their agreements with American Bagel, and the unambiguous language of the integration clause in the franchise agreements and the disclaimer in the 1993 UFOC, the Court concludes that reliance on statements about the sales experienced by Chesapeake Bagel Bakery franchisees was unreasonable as a matter of law. Because the plaintiffs cannot prove an essential element in bringing their IFA claim for these alleged misrepresentations, the Court will grant the defendants' motions for summary judgment on this issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("[T]here can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

### IV. Fraud

[5] Because this is a diversity case, this Court must apply Maryland choice of law rules to determine which state's substantive law applies here. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). For tort claims, such as fraud, Maryland adheres to the rule of *lex loci delicti*, i.e., it applies the law of the jurisdiction where the alleged wrong occurred. *Hauch v. Connor*, 295 Md. 120, 125, 453 A.2d 1207 (1983). The parties have agreed that, under this doctrine, the law of Virginia should apply as that is the jurisdiction in which the misrepresentations underlying this claim took place.

### A. Representations of Initial Investment Costs

To establish a fraud claim under Virginia law, the plaintiffs must prove the following elements by clear and convincing evidence: (I) a false representation, (ii) of a material fact, (iii) made intentionally and

knowingly, (iv) with the intent to mislead, (v) reliance by the party misled, and (vi) resulting damage to the misled party. *Evaluation Research Corp. v. Alequin,* 247 Va. 143, 439 S.E.2d 387, 390 (1994). In Virginia, "fraud must relate to a present or a pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." *Mortarino v. Consultant Eng'g Servs.,* 251 Va. 289, 467 S.E.2d 778, 781 (1996) (internal quotations omitted). However, the Supreme Court of Virginia has recognized an exception to this rule: at the time a party makes a promise, "the promisor's intention—his state of mind—is a matter of fact. When he makes his promise, intending not to perform, his promise is a misrepresentation of present fact, and if made to induce the promisee to act to his detriment, is actionable as actual fraud." *Colonial Ford Truck Sales, Inc. v. Schneider,* 228 Va. 671, 325 S.E.2d 91, 94 (1985).

Under similar reasoning, a party that makes an estimate based on certain facts impliedly represents that he knows of no other facts that would make the fulfillment of that projection impossible or improbable. *See* 2 Fowler V. Harper et al., The Law of Torts § 7.10, at 444 (2d ed. 1986) (In considering fraud claims, "courts have been increasingly willing to hold predictive statements material where the circumstances indicate to the addressee that the speaker has a factual basis for his prediction so that the existence of facts is implied by the representation. At the least a prediction implies that the speaker knows no facts that would make its fulfillment impossible. . . ."); Restatement (Second) of Torts § 525 cmt. f (1977) ("[A] statement that is in form a prediction or promise as to the future course of events may justifiably be interpreted as a statement that the maker knows of nothing which will make the fulfillment of his prediction or promise

impossible or improbable."). In the case at bar, the defendants stated a range of estimated start-up expenses "based on the latest available data" from within the Chesapeake Bagel Bakery franchise system. In providing this estimate, the defendants thus also made a representation of a present fact—that they knew of no information that would make the projection in the UFOC improbable.

█ Under this rationale, the Court concludes that the record, taken in the light most favorable to the plaintiffs, establishes triable issues with regard to their fraud claim. First, the plaintiffs have presented evidence of a false representation of a material, pre-existing fact: assuming that the plaintiffs did not receive an updated copy of American Bagel's UFOC in November 1994, then the cost information contained in the disclosure document was not "based on the latest available data" as the defendants had represented. Moreover, in providing the cost estimates in the UFOC, the defendants' impliedly represented that they knew of no facts that would make their projections impossible or improbable. The defendants could not possibly maintain that the cost figures disclosed in the 1993 UFOC were probable in light of their revised estimates in the 1994 UFOC.

A review of the record in the light most favorable to the plaintiffs indicates that they relied on the defendants' representations prior to signing agreements in both December 1994 and June 1995. Furthermore, the plaintiffs could prove that their reliance was reasonable[9] as the factual misrepresentation occurred in American Bagel's official disclosure document, which is required under both state and federal law. Likewise, a rational jury could conclude that the defendants possessed the requisite intent to defraud through the consideration of circumstantial evidence,[10]

---

**9.** *See Metrocall of Del., Inc. v. Continental Cellular Corp.,* 246 Va. 365, 437 S.E.2d 189, 194 (1993) ("[I]t is essential that the defrauded party demonstrates the right to reasonably rely upon the misrepresentation.").

**10.** *See Flip Mortgage Corp. v. McElhone,* 841 F.2d 531, 537 (4th Cir.1988) (" 'Circumstantial evidence is not only sufficient, but in most cases [of fraud] is the only proof that can be

such as the defendants' repeated assurances that the cost assumptions in the plaintiffs' business plan were accurate despite the existence of contrary information in updated versions of the UFOC. *See Metrocall of Del., Inc.*, 437 S.E.2d at 193 ("Concealment of a fact that is material to the transaction, knowing that the other party is acting on the assumption that no such fact exists, is as much fraud as if existence of the fact were expressly denied."). Finally, the plaintiffs can show that they sustained compensable injuries as a result of the defendants' fraudulent actions: the plaintiffs aver that they never would have entered into any of the agreements in either December 1994 or June 1995 had they been made aware of the updated cost estimates in the later versions of the UFOC.

While the disputed facts preclude granting the defendant's motions for summary judgment on the fraud claim related to misrepresentations about initial investment costs, the record, likewise, does not permit the Court to grant the plaintiffs' cross-motion on this issue. As discussed above, the record taken in the light most favorable to the defendants would allow a rational trier of fact to conclude that the plaintiffs did in fact receive a copy of the 1994 UFOC in November 1994. Based on this assumption, the plaintiffs could not assert that they reasonably relied on representations in the 1993 UFOC prior to entering into either the December 1994 or the June 1995 agreements. Accordingly, the Court finds the resolution of this claim must await consideration by a jury.

### B. Representations of Average Store Sales

■ For the same reasons discussed in conjunction with the IFA claim, the Court grants the defendants' motions for summary judgment in connection with the plaintiffs' fraud claim as it relates to misrepresentations of average store sales in the Chesapeake system. Based on the clear and unambiguous integration clause in the franchise agreements signed by the

adduced.' ") (quoting *Cook v. Hayden*, 183 Va.

parties and the disclaimer in the UFOC, the Court finds that reliance on these alleged misstatements was unreasonable as a matter of law. Because reasonable reliance is an essential element in proving fraud, the plaintiffs' claim fails.

### V. Negligent Misrepresentation

As with the fraud claim, the alleged misrepresentations underlying the plaintiffs' negligent misrepresentation claim occurred primarily in Virginia. Accordingly, the parties have agreed that the Court should apply Virginia law in addressing this count.

■ Federal courts applying Virginia law repeatedly have determined that Virginia does not recognize a general cause of action for negligent misrepresentation. *See Bentley v. Legent Corp.*, 849 F.Supp. 429, 434 (E.D.Va.1994), *aff'd sub nom. Herman v. Legent Corp.*, 50 F.3d 6, 1995 WL 115879 (4th Cir.1995); *Joyce v. Lincoln Nat'l Life Ins. Co.*, 845 F.Supp. 353, 354 (E.D.Va.1993), *aff'd sub nom. Joyce v. Benefits Mktg. Group, Inc.*, 32 F.3d 562, 1994 WL 423848 (4th Cir.1994); *Haigh v. Matsushita Elec. Corp.*, 676 F.Supp. 1332, 1349–50 (E.D.Va.1987). Because the Supreme Court of Virginia has failed to acknowledge the tort of negligent misrepresentation, this Court, applying Virginia law, will decline to do so. Accordingly, the Court will grant the defendants' motions for summary judgment dismissing this claim.

### VI. Maryland Franchise Registration and Disclosure Law

In addition to their IFA and common law claims, the plaintiffs also assert that defendants' actions give rise to liability under the Maryland Franchise Registration and Disclosure Law ("MFRDL"). *See* Md.Bus.Reg.Code Ann. §§ 14–201 to 14–233. As the basis for this contention, the plaintiffs first state that the Consolidated, Amended and Restated Area Development

203, 31 S.E.2d 625, 627 (1944)).

Agreement signed by the parties in August of 1996 contained a provision declaring that the contract was to be construed in accordance with the laws of the State of Maryland.

The MFRDL declares that a franchisor incurs civil liability under the statute in the following instances:

(a) *Grounds.*—(1) A person who sells or grants a franchise is civilly liable to the person who buys or is granted a franchise if the person who sells or grants a franchise offers to sell or sells a franchise:

(I) without the offer of the franchise being registered under this subtitle; or

(ii) by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, if the person who buys or is granted a franchise does not know of the untruth or omission.

. . . .

(b) *Action to recover damages.*—The person who buys or is granted a franchise may sue under this section to recover damages sustained by the grant of the franchise.

Md.Bus.Reg.Code Ann. § 14–227.

 Although not addressed by the parties, the Court finds that the 1996 agreement did not actually involve the sale of franchises and therefore does not give rise to a private cause of action under § 14–227 of the MFRDL. Instead, the parties entered into this contract "to essentially clean up the fact that [they] had two distinctive area development agreements, and wanted to consolidate those into a single agreement." Flinn Dep. at 164. The plaintiffs had already obligated themselves to developing the territories specified in the 1996 agreement in the earlier AFDA's executed in December 1994 and June 1995. At the time the parties signed the 1996 agreement, the plaintiffs were no longer prospective fran-

chisees, but rather had already committed themselves to the full extent of their contractual obligations. Thus, in entering into the 1996 consolidated AFDA, the defendants did not engage in the sale or grant of a franchise as envisioned in § 14–227. Accordingly, the execution of this contract, with its Maryland choice of law provision, did not implicate the protections provided in the MFRDL.

As a secondary basis for invoking the MFRDL, the plaintiffs contend that "to the extent [American Bagel] was a Maryland corporation at relevant times, the offers to sell franchises by [American Bagel] to plaintiffs were made and accepted in Maryland," pursuant to Md.Bus.Reg.Code § 14–203(a)(2)(iii) and (iv). Compl. ¶ 60. The Court concludes, however, that this assertion is without merit as there is no evidence in the record that either the defendants made any offers to sell Chesapeake Bagel Bakery franchises, or that plaintiffs accepted any such offers, in Maryland. The defendants' motions for summary judgment on the plaintiffs' claim under Maryland statutory franchise law is therefore granted.

### VII. Breach of Contract

 The plaintiffs allege that Defendant, American Bagel breached the franchise agreements signed by the parties in December 1994 by failing, in various capacities, to "provide support and training related to the management and operation of Chesapeake Bagel Bakery franchises." Compl. ¶ 53. The plaintiffs argue that under the terms of the December 1994 franchise agreements, American Bagel "promised to communicate to plaintiffs its 'know-how' in all phases of the business, and to use its 'best efforts to ensure that the Restaurant is planned properly.' " Pltf. Mem. at 34 (quoting December 3, 1994 Franchise Agreement ¶ 3, at 5–6). The plaintiffs further state that American Bagel "specifically promised assistance in 'site selection, layout and design of the Restaurant' and to give advice 'on the proper selection of equipment.' " *Id.* Based

on these contractual provisions, the plaintiffs conclude that American Bagel was required "to either: 1) show plaintiffs how to build and equip their stores at a cost which would allow them to be successful; or 2) to reveal the true facts to plaintiffs which related to building and equipping the stores."

Even viewing the record in the light most favorable to the plaintiffs, the Court concludes that American Bagel adequately performed these contractual obligations. First, the plaintiffs admit that American Bagel provided advice on site selection, layout, and the design of their restaurants in both Northville and Troy. Anthony Dep. at 286. Likewise, the plaintiffs admit that American Bagel furnished the plaintiffs with advice on running their stores after they opened. *Id.* at 287. In addition, American Bagel provided the plaintiffs with a thirty-day training program covering various food preparation techniques, such as baking bagels from scratch, and issues related to the management and operation of individual restaurants. Finally, American Bagel supplied the plaintiffs with multiple manuals and additional information related to the bagel business, including a catering manual, a media manual, an operations manual, a marketing manual, catering signs and flyers, register manuals, and a kettle/oven and mixer manual. American Bagel Mem. at 17.

Based on the facts presented, the Court thus concludes that the franchisor sufficiently advised the plaintiffs on site selection, layout, and the design of their restaurants, communicated their "know-how" in all aspects of the bagel business, and acted to ensure that the stores were properly planned. Despite the plaintiffs' attempts, the Court will not extrapolate a specific, independent *contractual* duty to disclose start-up costs from the language in the franchise agreements. In particular, the "best efforts" provisions in the contracts do not reach so far as to encompass such a requirement. Accordingly, the Court will grant American Bagel's motion for summary judgment on the plaintiffs' breach of contract claim.

## VIII. Breach of Contract/Unjust Enrichment Based on Dissemination of Plaintiffs' Business Plan

As previously mentioned, the plaintiffs compiled an extensive business plan assessing the viability of operating a Chesapeake Bagel Bakery prior to entering the various contractual agreements with American Bagel. The plaintiffs intended to use the plan "as a way to secure investors in their franchises." Compl. ¶ 65. On October 12, 1994, the plaintiffs met with Defendants, Alan Manstof and Michael Robinson, in Virginia, seeking approval as Chesapeake franchisees. Anthony Dep. at 89, 94. During this meeting Mr. Manstof briefly reviewed the plaintiffs' plan and asked if he could keep a copy of it. *Id.* at 94. The plaintiffs agreed but stated that the plan was "for [his] eyes only" and therefore was not to be distributed to any third parties. *Id.* Mr. Manstof allegedly confirmed that he would not disclose the plan to anyone else. *Id.;* Flinn Dep. at 62.

In mid–1995 to early 1996, the plaintiffs discovered that "many other prospective franchisees were provided copies of this confidential business plan." Compl. ¶ 70. In addition, the plaintiffs alleged that Defendant, Dan Rowe, retyped the plan "onto his own computer, made a few superficial changes and kept copies for himself in order to open and operate his own Chesapeake Bagel Bakery franchises in the Denver area." *Id.* Based on these facts, the plaintiffs have sued that the defendants for breach of contract and unjust enrichment.

### A. Breach of Contract

As noted in conjunction with the plaintiffs' fraud claim, this Court must apply Maryland conflict of laws principles to determine which state's substantive law controls the breach of contract claim. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). When determining which law controls the enforceability and effect of a contract, Maryland courts generally apply the principle of *lex loci contractus. Kramer v. Bally's Park Place, Inc.,* 311 Md. 387, 390,

535 A.2d 466 (1988). Under this rule, the law of the jurisdiction where the contract was made determines its validity and construction. *Id.* Thus, because the agreement between the plaintiffs and Mr. Manstof concerning the business plan took place in Virginia, the substantive law of that state will govern the resolution of this breach of contract claim.

 Under Virginia law, the essential elements for breach of contract are: (1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to the plaintiff. *Brown v. Harms,* 251 Va. 301, 467 S.E.2d 805, 807 (1996). "A cause of action does not evolve unless all of these factors are present. Specifically, without injury or damage to the plaintiff, no right of action accrues." *Locke v. Johns–Manville Corp.,* 221 Va. 951, 275 S.E.2d 900, 904 (1981).

 Even if the allegations in the complaint pertinent to the breach of contract claim are true, it is not apparent from the record that the plaintiffs suffered any compensable damages. The Supreme Court of Virginia has recognized that "the proper measure of damages … is the sum that would put [the non-breaching party] in same position, as far as money can do it, as if the contract had been performed." *Estate of Taylor v. Flair Property Assocs.,* 248 Va. 410, 448 S.E.2d 413, 416 (1994). The plaintiffs were required to "furnish evidence of sufficient facts to permit the trier of fact to make an intelligent and probable estimate of the damages sustained." *Id.* The Court finds such evidence wanting in this case. The plaintiffs have not explained the actual harm that they sustained as a result of Mr. Manstof's failure to maintain the confidentiality of their business plan. In particular, the Court cannot ascertain any effect on the plaintiffs' business resulting from the dissemination of the plan to other prospective franchisees. Accordingly, the Court grants the defendants' motion for summary judgment for the breach of contract claim.

### B. Unjust Enrichment

 Although Maryland courts have not enumerated conflict of laws principles to be considered in determining which state's laws to apply to an unjust enrichment claim, the Restatement (Second) of Conflict of Laws § 221 (1971) provides helpful guidance. Under the restatement test, the local law of the state which "has the most significant relationship to the occurrence and the parties" should be applied. The restatement outlines the factors that should be taken into account in making this determination:

> (a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,
>
> (b) the place where the benefit or enrichment was received,
>
> (c) the place where the act conferring the benefit or enrichment was done,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>
> (e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

Based on these criteria, the Court agrees with the parties in concluding that the law of Virginia should apply to the resolution of this issue. In particular, the Court notes that the benefit was both conferred and received in Virginia, both American Bagel and RDC are domiciled in Virginia, and the business plan was situated in Virginia at the time of the enrichment in October 1994.

The United Stated District Court for the Eastern District of Virginia, applying Virginia law, has stated that a plaintiff can bring a claim for unjust enrichment "where the facts fail to establish that the parties established any form of agreement." *Nossen v. Hoy,* 750 F.Supp. 740, 744 (E.D.Va.1990). However, even assuming that the agreement between the plain-

tiffs and Mr. Manstof did not bind all of the defendants, the Court concludes that the plaintiffs cannot make out a cognizable claim for unjust enrichment. Under Virginia law, such a claim "rests upon the doctrine that a man shall not be allowed to enrich himself unjustly *at the expense of another.*" *Kern v. Freed Co.,* 224 Va. 678, 299 S.E.2d 363, 365 (1983) (internal quotations omitted) (emphasis added). *See also Nossen,* 750 F.Supp. at 744 (noting that the facts must "establish that a defendant has been unjustly enriched *at the expense of the plaintiff.*" (emphasis added)).

For the reasons discussed above, there is no evidence that the defendants were enriched "at the expense of" the plaintiffs. The plaintiffs have failed to establish that they assumed any additional costs, lost profits, or missed business opportunities as a result of the distribution of their business plan to other Chesapeake franchisees. Anthony Dep. at 177. In addition, the plaintiffs had already invested their considerable sweat equity in the plan at the time they decided to provide Mr. Manstof with his copy, hoping to use the compilation as a tool to attract other investors, Compl. ¶ 65, and obtain approval from the defendants as a franchisee. Anthony Dep. at 89. Thus, the plaintiffs' claim for unjust enrichment claim is fatally flawed as a matter of law because of their failure to illustrate the incurrence of any detriment in providing Mr. Manstof with a copy of the plan. Because the plaintiffs have failed to make a sufficient showing on an essential element of this claim, the Court grants the defendants' motions for summary judgment on this issue.

## IX. Misappropriation of Trade Secrets

The plaintiffs have asserted that the defendants' distribution of the business plan, in violation of Mr. Manstof's promise to the plaintiffs, constitutes a misappropriation of trade secrets in violation of the Maryland Uniform Trade Secrets Act ("MUTSA"). Md. Com. Law II Code Ann. §§ 11–1201 to 11–1209. At the outset, the Court is unclear as to the basis for applying Maryland law when the alleged misappropriation of the plan actually occurred in Virginia. However, the same analysis would apply under either Virginia or Maryland law as both states have adopted trade secret statutes which closely track the Uniform Trade Secrets Act. *Avtec Sys., Inc. v. Peiffer,* 21 F.3d 568, 574 (4th Cir.1994). In addition, the Maryland legislature has dictated that the MUTSA "be applied and construed to effectuate its general purpose to make uniform the law with respect to" trade secrets among the states that have enacted the Uniform Trade Secrets Act. Md. Com. Law II Code Ann. § 11–1208.

The MUTSA defines "trade secret" as follows:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 11–1201(e). Stated succinctly, "to be protected under Maryland law, information must be secret, and its value must derive from the secrecy. In addition, the owner of the information must use reasonable efforts to safeguard the confidentiality of the information." *Montgomery County Ass'n of Realtors, Inc. v. Realty Photo Master Corp.,* 878 F.Supp. 804, 814 (D.Md. 1995), *aff'd,* 91 F.3d 132, 1996 WL 412584 (4th Cir.1996).

As an initial matter, the Court must determine whether the business plan constitutes a "secret" as required under the MUTSA. The Court of Special Appeals of Maryland has noted that a manufacturer's marketing plan did not constitute a protectable trade secret under Maryland law, in part, because it was based on information "readily available

from the marketplace." *Optic Graphics, Inc. v. Agee,* 87 Md.App. 770, 788, 591 A.2d 578 (1991). The court specifically observed that the defendants could have obtained the same information in the plaintiff's marketing plan "simply by talking with prospective customers." *Id.* While the business plan at issue in the case at bar does contain some public information and facts ascertainable from the marketplace, it likewise includes personal insights and analysis brought to bear through diligent research and by marshaling a large volume of information. Unlike *Optic Graphics,* an attempt to independently duplicate the plaintiffs' efforts in the instant case would be an onerous task.

■ The United States District Court for the Eastern District of Pennsylvania has recognized that "[t]he fact that individual forms in marketing material or in plaintiff's proposal book were compilations of public information does not itself preclude a finding that the combination of the included elements affords a competitive advantage and is not itself in the public domain." *National Risk Management, Inc. v. Bramwell,* 819 F.Supp. 417, 431–32 (E.D.Pa.1993). The court continued:

> The combination of information in the proposal book reflected market research preformed [sic] by plaintiff and decisions to include and exclude certain elements from a larger pool of data. It is this, rather than the data contained in the individual forms generally known in the self insurance business, which may arguably contain a significant degree of novelty, however, slight, to be excluded from general knowledge, and may qualify the proposal book as a trade secret.

*Id.* at 432. *See also Picker Int'l Corp. v. Imaging Equip. Servs., Inc.,* 931 F.Supp. 18, 38 (D.Mass.1995) ("A compilation of public information is protected if that information is, as a result of a business' efforts, combined in a unique way."), *aff'd,* 94 F.3d 640, 1996 WL 480214 (1st Cir. 1996); *Mettler–Toledo, Inc. v. Acker,* 908 F.Supp. 240, 247 (M.D.Pa.1995) ("The fact

that individual pieces of information claimed to be confidential are available to the general public does not defeat a claim f confidentiality if the value of the information stems from its compilation or collection in a single place or in a particular form which is of value."); *ISC—Bunker Ramo Corp. v. Altech, Inc.,* 765 F.Supp. 1310, 1322 (N.D.Ill.1990) ("[T]he effort of compiling useful information is, of itself, entitled to protection even if information is otherwise generally known."). Similarly, the Fourth Circuit observed that "although a trade secret cannot subsist in information in the public domain, it can subsist in a *combination* of such information as long as the combination is itself a secret." *Comprehensive Technologies Intern., Inc. v. Software Artisans, Inc.,* 3 F.3d 730, 736 (4th Cir.1993) (emphasis in the original). Thus, applying the rationale set forth in these decisions, the Court concludes that the plaintiffs' extensive compilation of information and analysis in their business plan qualifies as a trade secret.

■ Likewise, the Court finds that the business plan derived value from its secrecy. The Court recognizes that the plaintiffs cannot claim damages for "[t]he actual loss caused by misappropriation" or "[t]he unjust enrichment caused by misappropriation that is not taken into account in computing actual loss," Md. Com. Law II Code Ann. § 11–1203(b), for the reasons discussed in the preceding section. However, the MUTSA provides that damages caused by misappropriation alternatively "may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret." *Id.* § 11–1203(c). Under this provision, the plaintiffs in the case at bar could argue that they are entitled to monetary damages in the form of royalties as a result of the defendants' unauthorized distribution of their business plan to prospective franchisees. Based on these potential royalty payments, the business plan "[d]erives independent economic value ... from not being generally known to, and not being readily ascertainable by proper

means by" the defendants and prospective Chesapeake franchisees. *Id.* § 11–1201(e)(1).

The final prong that the plaintiffs must prove in bringing their misappropriation claim is that they took reasonable measures to ensure the secrecy of their business plan. *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993). The Fourth Circuit has noted that "[s]ecrecy is a question of fact" to be determined by the circumstances presented in each case. *Id.* In the case at bar, the plaintiffs drafted an extensive confidentiality agreement that they had "most potential investors sign" when they received a copy of the business plan. Anthony Dep. at 312. The problem for the plaintiffs is that they only produced five executed copies of the confidentiality agreement when they distributed the business plan to over fifteen individuals. When questioned as to whether he recalled ever receiving any confidentiality agreements from other individuals who were given the business plan, Mr. Anthony responded, "I mean I don't remember. I think I probably got—had more of them but maybe not. This might be it." Anthony Dep. at 424. Mr. Anthony's equivocating response to this question reveals that the plaintiffs did not act diligently to protect the secrecy of their business plan. The Supreme Court has observed that the disclosure of a trade secret "to others who are under no obligation to protect the confidentiality of the information" extinguishes the property right in the disclosure. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). Under this reasoning, the plaintiffs' failure to exact agreements from potential investors to maintain the secrecy of the business plan is inconsistent with recognition of the document as a trade secret under the MUTSA.

In addition, the Court does not find the boilerplate language on the cover of the business plan stating that "[t]his memorandum is for the exclusive use of the persons to whom it is given and is not to reproduced or redistributed" precludes the denial of trade secret status. This sentence appears at the end of a general disclaimer, cautioning investors as to the risks involved in making an investment in the business described in the plan. The language is not highlighted or isolated so as to put one on immediate notice that the plan constitutes a trade secret that the authors of the plan are actively seeking to protect.

Taking the facts as a whole, the Court concludes that the plaintiffs simply did not act reasonably in seeking to ensure the secrecy of their plan. Because the plaintiffs have failed to adduce sufficient proof of this essential element of their misappropriation claim to ward off summary judgment under *Anderson* and *Celotex*, and the defendants' motions for summary judgment on this count will be granted.

## X. Plaintiffs' Claim for Declaratory Judgment/AFC's Counterclaims for Breach of Contract

In May 1997, Defendant, AFC acquired certain assets from American Bagel, including American Bagel's interest in Chesapeake Bagel Bakery Marks, then-existing Chesapeake Bagel Bakery AFDA's and franchise agreements, and American Bagel's receivables. AFC Mem. at 5. The plaintiffs have filed a declaratory judgment claim against AFC, seeking rescission of the franchise agreements, AFDA's, and the promissory note entered into by the plaintiffs and AFC's predecessor in interest, American Bagel, based on American Bagel's "fraud, misrepresentation, concealment, gross negligence, and various statutory violations." Compl. ¶ 83.[11] AFC opposes the plaintiffs' claim for rescission of the contracts in their motion for summary judgment and argues, instead, that it is

11. At the time the complaint was filed, AFC had notified the plaintiffs that they were in breach of the franchise agreements and AFDA's signed by the plaintiffs and American

Bagel in 1995 and 1996. Subsequently, AFC filed a number of counterclaims seeking enforcement of these contracts.

entitled to judgment as a matter of law based on various breaches of the franchise agreements outlined in its counterclaims.

## A. Rescission

As an alternative to seeking damages, rescission is an equitable remedy available under Virginia law to plaintiffs against whom a fraud has been perpetrated. *See Horner v. Ahern,* 207 Va. 860, 153 S.E.2d 216, 221 (1967) ("[O]ne complaining of fraud and deceit may either rescind what was done as a result thereof or affirm the action taken and sue for damages."). *See also George Robberecht Seafood, Inc. v. Maitland Bros. Co.,* 220 Va. 109, 255 S.E.2d 682, 683 (1979) (" '[A] false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always ground for rescission of the contract by a court of equity.' " (quoting *Wilson v. Carpenter,* 91 Va. 183, 21 S.E. 243, 244 (1895)).[12] The Court has ruled that the plaintiffs have presented triable issues relating to their fraud claim. To the extent that the plaintiffs are successful in prosecuting their fraud claim, they likewise could opt to void the contracts and seek restitution for amounts paid to American Bagel under the various franchise and development agreements.

The Supreme Court of Virginia has stated that "[a] party intending to repudiate a contract on the ground of fraud must act within a reasonable time and with great punctuality upon learning of the wrong. He will be deemed to have waived his right of repudiation if, after discovery of the fraud, he treats the contract as a subsisting obligation." *Link Assocs. v. Jefferson Standard Life Ins. Co.,* 223 Va. 479, 291 S.E.2d 212, 215 (1982). To this end, AFC emphasizes that the plaintiffs learned of American Bagel's alleged fraud at least by the fall of 1996. Mr. Flinn testified at his deposition that the plaintiffs, at that time, felt that they had been "fraudulently induced into signing the contracts and the agreement with ABC to open these stores through the representation of construction costs that were dramatically lower than the actual costs." Flinn Dep. at 196. Likewise, AFC points out that in March 1997, Mr. Anthony sent American Bagel a letter accusing the franchisor of, among other things, a "history of misrepresentations," and attempted to negotiate concessions with regard to future development, the return of prepaid fees, and the waiver of outstanding and future franchise fees.

AFC thus asserts that the plaintiffs failed to promptly notify American Bagel that they intended to repudiate the contracts based on the franchisor's fraudulent conduct. AFC contends, instead, that the plaintiffs chose to treat the agreements as subsisting obligations through the attempted negotiated concessions and continued operation of their restaurants within the Chesapeake system until AFC terminated the franchise relationship in October 1997. Accordingly, AFC argues that the plaintiffs have waived any right to rescind the agreements under Virginia law.

The Supreme Court of Virginia has noted, however, that "proof of waiver, usually a question for the trier of fact, must be clear." *Link Assocs.,* 291 S.E.2d at 216. *See also Management Enters., Inc. v. Thorncroft Co.,* 243 Va. 469, 416 S.E.2d 229, 232 (1992) ("Usually, proof of waiver is a question for the trier of fact."); 12 Samuel Williston, A Treatise on the Law of Contracts § 1526, at 622–23 (3d ed.1970) (noting that if rescission "is desired, it must be sought with reasonable promptness after the fraud has been discovered. Reasonable time is generally considered a question of fact to be determined by the jury."). Viewing the facts in the light most favorable to the plaintiffs, a reasonable jury could conclude that the plaintiffs did not become fully aware that the defendants had provided misleading

---

**12.** Because Virginia law governs to the plaintiffs' fraud claim, the Court likewise will analyze Virginia law to determine the applicability of rescission as an equitable remedy for fraud.

initial investment cost estimates until late in 1996. Mr. Flinn stated that from the "second quarter '96 through probably the end of '96," the plaintiffs conducted an investigation into whether it was possible to open a Chesapeake Bagel Bakery for less than $400,000. Flinn Dep. at 29. At the end of that period, they concluded that it was not feasible, and, therefore they were on notice that the defendants had made fraudulent misrepresentations about the initial investment costs at that time. The Court cannot say that the plaintiffs' decision to wait until they filed suit in October 1997 to rescind the contracts was unreasonable as a matter of law. The determination as to whether the plaintiffs waived their opportunity to repudiate the contracts requires a factual analysis.[13]

■ The *Link Assocs.* court likewise added that "[a] waiver, an equitable principle often applied at law, must be distinctly made with full knowledge of the rights waived; and the fact that the defrauded party knows his rights, and intends to waive them must plainly appear." 291 S.E.2d at 216. The March 16, 1997 letter in which Mr. Anthony proposed certain changes to the future relationship between the plaintiffs and American Bagel does not constitute, in this Court's judgment, a plain intent to waive the right to rescind the contracts at issue in this case. Instead, the letter contains an attempt to reform the agreements signed by the parties based in part on the defendants' misrepresentations of initial investment expenses. Once the defendants rejected this proposal, the plaintiffs moved to rescind the contracts when they filed suit in October 1997. Although they attempted to resolve their differences through a continuing relationship with American Bagel, the plaintiffs did not waive their right to rescind by continuing to recognize the con-

tracts as subsisting obligations *in their original form.*

AFC also argues that rescission is neither equitable or practical in this case because the plaintiffs have not offered to return AFC to the pre-contract status quo. AFC contends that the plaintiffs must " 'demonstrate an unconditional willingness to return to [AFC] both the consideration that was given by [AFC's predecessor in interest, American Bagel,] and any benefits received under the contract.' " AFC Reply Mem. at 5 (quoting *Bagel Enters., Inc. v. Baskin & Sears,* 56 Md.App. 184, 201, 467 A.2d 533 (1983)). AFC maintains that "Plaintiffs have never offered to return AFC to the pre-contract status quo by returning the income generated by their two Chesapeake Bagel Bakery restaurants, nor is it likely that they would want to do so." The plaintiffs counter that "[p]rior to the franchise contracts, AFC did not have any of plaintiffs' franchise fees. Plaintiffs, therefore, cannot be expected to tender such fees in order to return AFC to its pre-contract status quo." Pltf. Reply to AFC at 5.

■ The Court finds neither of the arguments presented by the parties to be wholly availing. The Court of Appeals of Virginia has observed that "[g]enerally, to warrant rescission of the contract, the court must be able substantially to restore the parties to the position they occupied before entering into the contract." *Webb v. Webb,* 16 Va.App. 486, 431 S.E.2d 55, 61 (1993) (internal quotations omitted). However, "[i]t is immaterial that the status quo cannot be literally restored. The general rule or restoration is not strictly applied in the case of fraud, because it would become a loophole to escape the consequences of a fraudulent act. Equity makes a reasonable application of the rule by requiring whatever fair dealing requires under all of

---

13. The plaintiffs argue that they are entitled to summary judgment on their declaratory judgment action because AFC cannot produce any evidence that it has been prejudiced by the plaintiffs' delay in claiming rescission of the various franchise contracts. Pltf. Reply to AFC at 4. The Supreme Court of Virginia noted, however, that "the duty of prompt disaffirmance is not dependent upon the proof of harm to the deceiving party caused by the delay." *Link Assocs.,* 291 S.E.2d at 215.

the circumstances of the particular case, but it does not permit the rule [of restoration] to become a shield for wrongdoing." *Id.* at 62 (internal quotations and citations omitted).

Applying this reasoning to the case at bar, the Court finds that under the various contracts signed by the parties, the plaintiffs paid significant sums in prepaid expenses and, at least for a time, paid additional monthly royalties and fees to American Bagel. In exchange, the plaintiffs received at least some benefit from membership in the Chesapeake system. It is now impossible literally to go back to the status quo ante, because the plaintiffs have already "enjoyed" the advantages of operating in the Chesapeake system. Thus, should the plaintiffs ultimately succeed in proving their fraud claim, and then opt to rescind the contracts, they would be entitled to receive back from AFC, as successor to American Bagel, whatever "fair dealing" requires. In other words, it would be necessary to balance the benefits that the plaintiffs received during their term as a Chesapeake franchisee with the money that they paid to American Bagel in order to approximate the pre-contract status quo.

▇▇ Finally, the Court does not find that the execution of the August 1996 Consolidated and Amended Development Agreement constituted a waiver of the plaintiffs' fraud claim, as AFC suggests. AFC emphasizes that the plaintiffs opened their Northville store in December 1995 and their Troy restaurant in March 1996. Thus, AFC posits that "by March 1996 Plaintiffs knew that ABC's estimates for construction costs were lower than those experienced by Plaintiffs. Further, Mr. Flinn testified that it 'became obvious' in the second and third quarters of 1996 that they could not open any more stores because the construction costs were too high." AFC Reply Mem. at 5–6. AFC, therefore, deduces that the plaintiffs knew that American Bagel had misrepresented construction costs, and "[r]ather than terminate their agreements and sue ABC for fraud, Plaintiffs executed a new agreement with ABC" in August 1996. *Id.* at 6. As a result, AFC concludes that the execution of the consolidated development agreement in the face of these facts constituted "a knowing and intentional waiver of plaintiff's right to seek damages for fraud." *Id.*

The Court, however, is not persuaded by AFC's argument. As discussed above, a review of the record in the light most favorable to the plaintiffs reveals that they engaged in several months of research in 1996 to determine whether they could have built their stores for less money. Mr. Flinn testified at his deposition that this period of review spanned from the "second quarter of '96 through probably the end of '96." Flinn Dep. at 29. Thus, the plaintiffs arguably did not fully appreciate the alleged misrepresentations related to initial investment expenses until the final quarter of 1996. The most that the plaintiffs definitively knew in August 1996 was that their own expenses had significantly exceeded the estimates provided by the defendants. Accordingly, the Court will not rule that the plaintiffs waived their right to assert their fraud claim by signing the consolidated development agreement in August 1996, based on the facts in the record.

Based on the foregoing, the cross motions for summary judgment filed by the parties relating to the plaintiffs' declaratory judgment claim, seeking rescission of the numerous contracts at issue in this case, are denied.

### B. AFC's Counterclaims for Breach of Contract

▇▇ AFC argues that it is entitled to summary judgment on its counterclaims for breach of contract, stemming from the franchise agreements and the promissory note signed by the plaintiffs in 1994 and 1995. First, AFC claims that it is entitled to unpaid service fees, advertising fees, and interest under the terms of the franchise agreements governing the plaintiffs' Northville and Troy restaurants from November 1996 until AFC terminated the

agreements on October 1, 1997. Second, AFC asserts that it is entitled, as a matter of law, to the outstanding $10,000 balance on the plaintiffs' promissory note and reasonable attorneys' fees incurred in connection with the collection on the note. Third, AFC maintains that the plaintiffs breached various post-termination provisions of the franchise agreements by failing to promptly return all Chesapeake Bagel Bakery manuals and materials to AFC; continuing to use and refer to Chesapeake Bagel Bakery marks on exterior signage, cash register receipts, advertisements, and flyers; and continuing to use operating procedures in their bagel stores that were prescribed by the Chesapeake System. Fourth, AFC argues that it is entitled to summary judgment based on the plaintiffs' breach of the covenants not to compete included in the franchise agreements. AFC initiated this claim because "Plaintiffs opened two bagel restaurants called 'Motor City Bagels' at the exact location where the Northville and Troy Chesapeake Bagel Bakery restaurants were located." AFC Mem. at 26. Finally, AFC states that, under the terms of the franchise agreements, it is entitled to recover its attorneys' fees and costs associated with the prosecution of its counterclaims for breach of contract.

The Court, however, cannot determine the validity of each of these counterclaims at this stage in the proceedings. In particular, should the plaintiffs prove to be successful in bringing their fraud claim, they could opt to rescind the franchise agreements and the promissory note signed by the plaintiffs in December 1994 and June 1995. In this eventuality, each of the counterclaims set forth by AFC would be based on voided contractual agreements, and thus would be of no effect. Accordingly, the Court denies AFC's motion for summary judgment on each of these counterclaims.

14. 15 U.S.C. §§ 1051–1127.

## XI. AFC's Counterclaims for Service Mark Infringement and Unfair Competition

AFC has moved for summary judgment on both its service mark infringement and unfair competition counterclaims as a result of the plaintiffs' unauthorized use of Chesapeake Bagel Bakery marks after the effective date of termination of the franchise agreements. Under the Lanham Act,[14] a party is entitled to bring a private cause of action for service mark infringement such that:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . .

. . .

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1). Likewise, the Lanham Act provides a cause of action for unfair competition whereby:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to affiliation, connection, or association of such person with another person, or as to origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. *Id.* § 1125(a).

▮▮▮▮▮▮ The Fourth Circuit has concluded that in order to prevail under either a trademark infringement or unfair competition claim, a plaintiff must prove that "it has a valid, protectable trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir.1995). *See also Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir.1987) (noting that a determination as to likelihood of confusion between two marks is the appropriate test for both trademark infringement and unfair competition claims). In the case at bar, the Court finds that the plaintiffs' use of the Chesapeake Bagel Bakery mark on their store signs and cash register receipts after the plaintiffs' franchise agreements had been terminated constituted service mark infringement and unfair competition under the Lanham Act.[15] *See Burger King Corp. v. Mason*, 710 F.2d 1480, 1492–93 (11th Cir.1983)

("Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks."); *Merry Maids Ltd. Partnership v. Kamara*, 33 F.Supp.2d 443, 445 (D.Md. 1998) ("[C]ontinued trademark use by one whose trademark license has been canceled satisfies the likelihood of confusion test and constitutes trademark infringement." (internal quotations omitted)); 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25.31, at 25–59 (4th ed. 1999) ("If, as a matter of contract law, a service mark or trademark license has ended, the licensee has no right to continue use of the licensed mark. Any such use is without the trademark owner's consent and constitutes infringement."). Despite the plaintiffs' efforts in removing the Chesapeake logo paper off of their store shelves, repainting the interior walls of their restaurants to cover the Chesapeake logo, changing the uniforms worn by store employees, posting and distributing a letter to customers notifying them that the restaurants were no longer Chesapeake Bagel Bakeries, and changing the menu to eliminate any reference to Chesapeake, the exterior signs on the plaintiffs' stores in Northville and Troy, and the register receipts, created a likelihood of confusion among members of the public precluded under the Lanham Act.[16]

15. AFC alleges that the plaintiffs' use of Chesapeake manuals in operating their restaurants also provides a basis for its Lanham Act claims. However, as the plaintiffs point out, the manuals were used only by their employees and there is no evidence that any consumer had access to the manuals or could be confused by the marks contained therein. Pltf. Mem at 31. Thus, the retention of these manuals does not provide support for AFC's claims.

In addition, to support its trademark infringement and unfair competition claims, AFC notes that the plaintiffs "distributed advertisements as late as March 1998 containing a header 'MOTOR CITY BAGELS' formerly Chesapeake Bagel Bakery the purpose of which could only have been to trade on the goodwill associated with the Chesapeake Ba-

gel Bakery name." AFC Mem. at 13. The Court, however, does not find that this fact provides support for the plaintiffs' Lanham Act claims as the statement in the advertisement was made "in the context of truthful corporate history and [was] unlikely to cause confusion." *Kusan Inc. v. Fairway Siding Corp.*, 7 U.S.P.Q.2d 1202, 1208 (D.Mass. 1988). As the plaintiffs note, the allusion to the Chesapeake Bagel Bakery mark is used to distinguish Motor City Bagels from Chesapeake and is, thus, "designed specifically to prevent confusion among consumers." Pltf. Mem. at 31.

16. In reaching this decision, it is not necessary for the Court to find actual confusion among consumers, but only the likelihood of confusion. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir.1984).

The Court recognizes that the plaintiffs' efforts to de-identify their stores greatly exceeded those of terminated franchisees in other reported Lanham Act cases where the franchisees continued to display the franchisors' logos on their signs. For example, in *Downtowner/Passport Int'l Hotel Corp. v. Norlew, Inc.*, 841 F.2d 214, 219 (8th Cir.1988), a terminated Downtowner hotel franchisee continued to use hotel supplies bearing the Downtowner logo and displayed Downtowner signs over the hotel and its main entrance for at least a year past the revocation of the franchise agreement. In concluding that the former franchisor had brought a valid trademark infringement claim, the Eighth Circuit found the record "devoid of any evidence negating confusion that potential patrons would experience upon entering the hotel after passing the two Downtowner signs. Their belief that [Downtowner] was the hotel's franchisor would be reinforced by the Downtowner paraphernalia inside the hotel." *Id.* Similarly, in *Mobil Oil Corp. v. Auto-Brite Car Wash, Inc.*, 615 F.Supp. 628, 631 (D.Mass.1984), the court noted that a terminated Mobil franchisee continued to display Mobil signs, sold Mobil oil and other products in containers with the Mobil mark, and sold non-Mobil gasoline "from Mobil's distinctive round pumps on which the name 'Mobil' had been covered with masking tape." The court observed that the former franchisee "no longer accepted Mobil credit cards, but took no other steps to inform customers that the gasoline was not Mobil." *Id.*

Unlike the franchisees in these cases, the plaintiffs took significant measures to eradicate Chesapeake Bagel Bakery marks from their stores. However, the display of Chesapeake signs on the exterior of the Northville and Troy restaurants following the termination of the plaintiffs' franchise agreements strikes the Court as likely to cause confusion among the bagel-consuming public. Despite the plaintiffs' extensive efforts to change the inside appearance of their restaurants, the use of Chesapeake register receipts would further contribute to the likelihood of consumer confusion. For these reasons, the Court concludes that AFC has presented sufficient facts to prove its trademark infringement and unfair competition claims under the Lanham Act.[17]

■ As a result of the plaintiffs' post-termination use of Chesapeake Bagel Bakery marks, AFC has requested that this Court issue a sweeping permanent injunction under 15 U.S.C. § 1116(a) to prevent any such conduct in the future. However, the record is devoid of proof that the plaintiffs have continued to engage in the acts about which AFC has complained. In addition to the changes alluded to above, the plaintiffs have now also replaced the sign on the exterior of their Northville store, and they are no longer using Chesapeake Bagel Bakery register receipts. Furthermore, the plaintiffs sold their Troy restaurant in March 1998. Because the Court is not convinced that there is a threat of future harm to AFC based on the plaintiffs' use of the Chesapeake Bagel Bakery mark, AFC's motion for summary judgment, requesting injunctive relief, is denied. *See Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 208 (4th Cir.1998) (denying request for injunction where there was no threat of future copyright infringement); *Reader's Digest Ass'n, Inc. v. Conservative Digest, Inc.*, 821 F.2d 800, 807 (D.C.Cir.1987) ("When a defendant has ceased its infringing conduct and shows no inclination to repeat the offense, a court

---

**17.** The same analysis and result would follow for AFC's state law service mark infringement and unfair competition claims. Because the facts giving rise to these claims occurred exclusively at the plaintiffs' restaurants in Northville and Troy, Michigan law applies. The United States District Court for the Western District of Michigan recently stated that the resolution of trademark infringement and unfair competition claims under the Lanham Act and Michigan common law "depends on one test: is there a likelihood of confusion." *Hair Assocs. v. National Hair Replacement Servs., Inc.*, 987 F.Supp. 569, 581 (W.D.Mich. 1997).

may not issue an injunction of the kind [the plaintiff] has requested.").

██ AFC likewise has claimed that it is entitled, as a matter of law, to treble damages, attorney fees, and costs under 15 U.S.C. § 1117(a) and (b) as a result of the plaintiffs' unauthorized, post-termination use of the Chesapeake Bagel Bakery mark on the signs and register receipts at their restaurants. Section 1117(a) states:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office or a violation under section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.... The court in exceptional cases may award reasonable attorney fees to the prevailing party.

The Fourth Circuit recently has emphasized that district courts have "a great deal of discretion... in fashioning a remedy" under this provision. *Larsen v. Terk Technologies Corp.*, 151 F.3d 140, 149–50 (4th Cir.1998); *See also Dick's Sporting Goods, Inc. v. Dick's Clothing & Sporting Goods, Inc.*, 12 F.Supp.2d 499, 500 (D.Md. 1998) ("The award of monetary damages, attorney fees and costs under the Lanham Act is committed to the sound discretion of the Court, based on the equities of each particular case.").

AFC argues that it is entitled to damages under 15 U.S.C. § 1117(a), because "[a] former franchisee's failure to pay royalties during the post-termination infringement constitutes real and compensable damage to the franchisor." AFC Reply at 9. Indeed, the Eleventh Circuit has recognized that "[r]oyalties normally received for the use of a mark are the proper measure of damages for misuse of those marks." *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1565 (11th Cir. 1986) (internal quotations omitted). However, the approach adopted by the Eleventh Circuit to calculate damages in such

situations has not been uniformly embraced by other courts. For example, the Eighth Circuit, in *Downtowner*, concluded that a revoked franchisee that continued to use the former franchisor's trademark had violated the Lanham Act's trademark protection provisions. Yet, the court remanded the case for the entry of nominal damages only, noting that "a review of the record indicates that any award greater than nominal damages would be based on sheer speculation." *Downtowner/Passport Int'l Hotel Corp.*, 841 F.2d at 220.

██ Despite the fact that AFC presented sufficient evidence to sustain its trademark infringement and unfair competition claims, this Court, in its discretion, does not find that AFC is entitled to damages as a matter of law at this stage in the litigation. Taking the facts in the light most favorable to the plaintiffs, they undertook significant measures to de-identify their restaurants in both Northville and Troy after the termination of the franchise agreements. As discussed above, they removed the Chesapeake logo paper off of their store shelves, repainted the interior walls of their restaurants to cover the Chesapeake logo, changed the uniforms worn by store employees, posted and distributed a letter to customers notifying them that the restaurants were no longer Chesapeake Bagel Bakeries, and changed the menu to eliminate any reference to Chesapeake. In both Northville and Troy, local zoning regulations precluded the plaintiffs from taking down their exterior Chesapeake Bagel Bakery signs without immediately replacing them with other, city-approved signs. Anthony Dep. at 460. In addition, replacing the Chesapeake register receipts proved to be a technological challenge which took time to reconcile. Anthony Dep. at 471. Based on the considerable efforts which the plaintiffs undertook to de-identify their stores, coupled with the possibility that a jury could find that the plaintiffs were defrauded into entering the franchise agreements underlying this suit, the Court does not find that the equities of this case require an award of damages to AFC at this time.

488

■ To recover the plaintiffs' profits under 15 U.S.C. § 1117(a), AFC has the burden of proving that the plaintiffs acted in bad faith in using the Chesapeake Bagel Bakery mark following AFC's termination of the franchise agreements. *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 753 (2d Cir.1996). In other words, AFC must show that the plaintiffs "acted with willful deception before the infringer's profits are recoverable by way of an accounting." *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1540 (2d Cir.1992). As the Sixth Circuit noted, in order for a court to order an equitable accounting and award profits, it is necessary for a plaintiff to show "not only that the infringer infringed, but that he did so with the deliberate intent to cause confusion, mistake or to deceive purchasers; in other words, to purposely palm off the infringer's goods as those of the infringed." *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 849 F.2d 1012, 1015 (6th Cir.1988) (internal quotations omitted). The Court concludes, however, that the record, in the light most favorable to the plaintiffs, fails to demonstrate as a matter of law that the plaintiffs acted with the deliberative intent to deceive consumers by continuing to display the Chesapeake Bagel Bakery mark on its exterior signs and cash register receipts following the revocation of the plaintiffs' franchise agreements. Instead, the plaintiffs took significant steps to differentiate themselves from the Chesapeake system, including the prominent display of a letter to customers explaining their disassociation with the Chesapeake system. The numerous changes imposed by the plaintiffs in their restaurants indicate that the plaintiffs were not attempting to "palm off" Chesapeake goods and services as their own. Thus, based on the record, the Court, in its discretion, does not find that equity requires an award of profits to AFC.

■ In addition to requesting that this Court award profits and damages, AFC has also moved for attorney fees as a matter of law under 15 U.S.C. § 1117(a). Under that provision, "[t]he court in exceptional cases may award reasonable attorneys fees to the prevailing party." The Fourth Circuit has stated that to prove an "exceptional case," a prevailing plaintiff "must show that the defendant acted in bad faith." *Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 599 (4th Cir.1992). As noted in the discussion above, the evidence in the record does not support a finding that the plaintiffs acted in bad faith at this juncture.

AFC argues that "[i]ntentional continued use of a mark by a terminated franchisee constitutes willful infringement, which justifies an award of ... attorneys' fees." AFC Reply at 8. Indeed, the plaintiffs' actions were "willful" to the extent that they did not completely de-identify their stores following the termination of the franchise agreements by, e.g., failing immediately to cover their exterior signs or change their register receipts. However, as the Fifth Circuit noted, a finding of willfulness does not necessarily require a trial court to determine that a case is "exceptional." *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 697 (5th Cir.1992). The court observed that "[a]n act is done 'willfully' if it is done voluntarily and intentionally and not because of accident or other innocent reason. This standard falls far short of the kind of culpability required to render a case 'exceptional.'" *Id.* (internal quotations omitted). In denying the plaintiff's claim for attorney fees, the Fifth Circuit concluded that "[w]hile we do not condone [the defendant's] infringement, its actions do not approach 'deliberate pirating' or 'egregious conduct.'" *Id.*[18] Similarly, the Court in this case does not, in its discretion, view the facts presented by the parties as rising to the level of bad faith. Based on the plain-

18. *See also U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1192 (6th Cir.1997) ("It does not ... follow that a case will always be 'exceptional' for the purposes of awarding attorney fees where the relevant conduct is found to be willful, fraudulent, and deliberate.").

tiffs' efforts to differentiate Motor City Bagels from the Chesapeake system, the Court does not find that this case presents "exceptional" circumstances which warrant the award of attorney fees. Thus, the Court denies the plaintiffs' motion for summary judgment for damages, profits, costs, and attorney fees under 15 U.S.C. § 1117(a).

■ AFC also argues that the plaintiffs' infringement constitutes counterfeiting under the Lanham Act, requiring an award of treble damages and attorneys' fees pursuant to 15 U.S.C. § 1117(b). This section applies, absent "extenuating circumstances," in cases that consist of "intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark ... in connection with the sale, offering for sale, or distribution of goods and services." 15 U.S.C. § 1117(b). The Sixth Circuit recently has held, however, that " § 1117(b) does not apply where, as in this case, a holdover franchisee continues to use the franchisor's original trademark after the franchise has been terminated. Although the use of an original trademark is without authorization, it is not the use of a counterfeit mark." *U.S. Structures, Inc.*, 130 F.3d at 1192. Under this analysis, the Court likewise denies AFC's motion for damages and attorney fees under 15 U.S.C. § 1117(b).

## XII. Conclusion

For the foregoing reasons, the Court DENIES the motion for summary judgment filed by Defendants, American Bagel, Alan Manstof, and Michael Robinson and the motion for summary judgment submitted by Defendant, Dan Rowe, as they pertain to the alleged misrepresentations of initial investment costs in the Chesapeake system within the context of the plaintiffs' Indiana Franchise Act and fraud claims. Likewise, the Court DENIES the plaintiffs' cross-motion for summary judgment on this same issue.

The Court GRANTS the motions for summary judgment filed by American Bagel, Mr. Manstof, and Mr. Robinson and

Mr. Rowe as they relate to alleged misrepresentations of average store sales in the Chesapeake system within the context of the IFA and fraud claims. In addition, the Court GRANTS the motions for summary judgment submitted by these defendants on the plaintiffs' negligent misrepresentation claim, Maryland Franchise Registration and Disclosure Law claim, breach of contract claim, the breach of contract/unjust enrichment claim related to the dissemination of the plaintiffs' business plan, and the misappropriation of trade secrets claim.

The Court DENIES the plaintiffs' motion for summary judgment, seeking rescission of the various contractual agreements entered into by the plaintiffs and American Bagel in 1994 and 1995. Likewise, the Court DENIES AFC's motion for summary judgment on its numerous counterclaims for breach of contract and its counterclaims for injunctive relief, damages, profits, costs, and attorney fees relating to the plaintiffs' violations of the Lanham Act's service mark infringement and unfair competition provisions.