(161 P.3d 786)
No. 94,950

FLEETWOOD FOLDING TRAILERS, INC., *Appellant,* v. The Coleman Company, Inc., *Appellee.*

Opinion filed June 29, 2007.

*Eldon L. Boisseau,* of Law Offices of Eldon L. Boisseau, L.L.C., of Wichita, and *Jeffrey T. Thomas* and *J. Scot Kennedy,* of Gibson, Dunn & Crutcher, LLP, of Irvine, California, for appellant.

*James D. Oliver,* of Foulston Siefkin LLP, of Overland Park, and *Mikel L. Stoud* and *Todd N. Tedesco,* of the same firm, of Wichita, for appellee.

Before HILL, P.J., MARQUARDT, J., and KNUDSON, S.J.

HILL, J: We consider here a directed verdict in a case arising from the dissolution of a trademark contract that permitted the use of one corporation's trademark by another. Believing that Fleetwood Folding Trailers, Inc. (FFT) had failed to abide by their agreement, the Coleman Co., Inc. (Coleman) successfully sued FFT for lost royalties, profits, punitive damages, and attorneys fees. FFT appeals.

The court directed a verdict on two key points. *First*, FFT had breached their contract by using Coleman's trademarks outside FFT's authorized territory. *Second*, FFT's continued use of Coleman's trademarks breached their agreement, infringed upon Coleman's federal and state common-law trademark rights, and violated federal law by creating a false designation of origin.

Resolving all facts and inferences reasonably drawn from the evidence in favor of FFT, we find that a directed verdict was properly granted to Coleman. Accordingly, we affirm.

## FACTS AND PRIOR PROCEEDINGS

FFT manufactured folding camping trailers and, with permission, placed Coleman's trademarks on them. Their business relationship began in 1989 with their first trademark license agreement. They renewed their agreement in 1994 and 2000.

In September 2002, Coleman conducted an audit of FFT. Based on that audit, Coleman told FFT that it had not fully complied with the agreement on unreported sales and advertising minimums. Over the next 6 months after the audit, Coleman advised FFT that it continued to misuse Coleman's trademarks. Finally, on April 11, 2003, Coleman sent written notification to FFT that FFT had breached the 2000 Trademark License Agreement.

Coleman alleged four general breaches of the agreement by FFT:

- FFT failed to submit details about five new models of trailers and obtain Coleman's approval to use its logo on them.
- FFT continuously failed to submit parts, catalogs, brochures, and other advertising materials for Coleman's approval as required by the contract.

- FFT failed to submit additional materials about its new Caravan trailer and continued to use inaccurate trademarks on the products.
- FFT sold trailers in Spain, Turkey, the Netherlands, Taiwan, and Norway without Coleman's approval.

FFT replied to Coleman's accusations. FFT thought that Coleman would support FFT's development of new products since Coleman would receive royalties from the sales. FFT denied failing to comply with the contract's approval procedures, stating that it had appreciated the informal relationship between the two companies that had developed over the years. FFT also contended that since it had submitted photos of the Caravan to Coleman and, in FFT's opinion, "if you've seen one Caravan, you've seen them all," no further information was necessary. FFT admitted it had sold trailers in five countries without Coleman's permission, but FFT claimed it was an oversight.

In May 2003, Coleman informed FFT, in writing, that FFT had failed to remedy the breaches. Accordingly, under paragraph 12.2 of the 2000 Trademark License Agreement, Coleman ended its relationship with FFT. Coleman advised FFT that, in accordance with paragraph 12.3, FFT was required to immediately cease all use of Coleman's licensed trademarks on all its materials and products.

In response, FFT filed a lawsuit against Coleman, seeking declaratory judgment on Coleman's unlawful termination of the agreement and also sought a temporary restraining order against Coleman from licensing its trademarks to other recreational vehicle manufacturers. Coleman counterclaimed, alleging that FFT's conduct constituted trademark infringement and FFT's unauthorized use of Coleman's trademarks entitled Coleman to punitive damages. Coleman also requested a preliminary injunction to prevent FFT from continuing to use its trademarks.

While considering both parties' requests for preliminary injunctions, the district court ruled that, based upon the 1989 and 2000 agreements of the parties, Coleman had a right to restrict the use of its name and trademarks and FFT had failed to establish any

right to continue the use of Coleman's name and trademarks after Coleman's termination of the agreement. The court did not grant Coleman's injunction at that time because the request required a determination of the ultimate issues in the case.

Soon afterwards, Coleman moved for reconsideration, asserting that FFT was still using Coleman's name and trademarks. In response, FFT argued that because the district court had yet to decide whether Coleman lawfully terminated the 2000 Trademark License Agreement, it was still authorized under that agreement to use Coleman's trademarks. In compliance with the agreement, FFT proffered royalty payments to Coleman for the continued use of Coleman's trademarks.

On August 18, 2003, the district court granted Coleman's motion for a temporary injunction and enjoined FFT and its affiliates from using Coleman's trademarks. Its order stated again that FFT did not have any right to use the Coleman name and trademarks.

The case was submitted to a jury in December 2004. At the conclusion of FFT's presentation of evidence, Coleman moved for a directed verdict on two grounds: (1) on FFT's breach of contract claim, and (2) for FFT's posttermination breach of contract and trademark infringement. After reviewing the undisputed facts, the district court decided that (1) FFT's sales of trailers outside its authorized territory violated the territorial provision of the contract; (2) FFT had failed to follow Coleman's approval process; (3) FFT's use of Coleman's trademarks exceeded the scope of the license; and (4) FFT had not cured its contract breaches. Accordingly, the district court granted Coleman's motion and directed a verdict.

The court submitted all remaining questions to the jury. The jury unanimously found (1) reasonable royalties in this case were $508,137; (2) FFT's postcontract termination conduct in using the trademark was willful or in bad faith; (3) FFT earned $4,665,735 in profits during the period of May 12 to August 20, 2003; (4) Coleman should be awarded punitive damages; and (5) FFT failed to prove that it reasonably relied on competent legal advice when it infringed on Coleman's trademarks.

Based on the jury's findings, Coleman moved to treble the award of profits and attorney fees, alleging that FFT's unauthorized trademark was a "counterfeit mark" according to the Lanham (Trademark) Act, 15 U.S.C. §1051 (2000) *et seq*. Under that Act, Coleman asserted that the district court was required to award to Coleman three times the profits made by FFT and award Coleman its attorney fees and costs. The district court concluded that the evidence clearly showed that FFT's conduct, combined with the jury's findings, satisfied the Lanham Act's definition of a counterfeit mark. Therefore, the court granted Coleman's motion.

In its final judgment, the court made three rulings pertinent to this appeal. *First*, it held that Coleman did not breach the 2000 Trademark License Agreement when it terminated its relationship with FFT. *Second*, because FFT's continued use of Coleman's trademarks breached the agreement, infringed upon Coleman's trademarks, and constituted a false designation of origin in violation of federal law, the district court decided that FFT owed Coleman reasonable royalties. *Third*, based on the jury's determination that FFT's infringement of Coleman's trademarks was willful, the district court ruled that Coleman was entitled to FFT's profits received during the period of infringement. Furthermore, since FFT's conduct constituted counterfeiting under the Lanham Act, the district court trebled the profits award and, in addition, awarded Coleman its attorney fees and litigation expenses. But, because of this enhanced award, the district court denied an additional award for punitive damages.

In this appeal, FFT raises five general issues. (1) Improper grant of directed verdict. In a two-fold argument, FFT contends that the question of what is a material breach of the agreement is a question of fact which should be decided by the jury and not the court; secondly, with the evidence submitted in its case, the question of whether FFT had cured any breach of the agreement is also an issue of fact for the jury and not an issue for the court. (2) Improper jury instruction about profits. FFT argues that there was insufficient evidence to prove that it had willfully infringed upon Coleman's trademark rights to support giving an instruction that the jury had to award Coleman all of FFT's profits. Also the court's

instruction erroneously told the jury it must award profits to Coleman if FFT had misused the trademarks. And, finally, the instruction should have informed the jury that the only profits it was to consider were those attributable to any unlawful use of the trademark, not all of FFT's profits. (3) Erroneous exclusion of evidence about a covenant not to compete in original contract. Here, FFT contends that the jury awarded a windfall to Coleman because it was not told that Coleman could not have licenced its trademark with any other company in the RV industry. A covenant not to compete in the original agreement between Coleman and the parent company of FFT allowed only FFT to use the trademarks. FFT thinks the jury would have reacted differently had it known. (4) Lanham Act misinterpretation. According to FFT, the court erred when it concluded FFT had engaged in counterfeiting of Coleman's trademarks. (5) No need for punitive damage instruction. For guidance in any future retrial of this matter, FFT argues that the Lanham Act precludes any award for punitive damages that might have been granted in this case. Therefore, FFT argues, with no possibility of a punitive damage award, there is no need for such an instruction.

## ANALYSIS

We begin first with some general rules concerning directed verdicts and how we review them. From there, we deal with the issues in the order set out above. We will incorporate additional facts into this opinion, especially provisions of the contract, as needed.

In deciding a motion for directed verdict, the trial court as well as the appellate court must resolve all facts and inferences reasonably drawn from the evidence in favor of the party against whom the ruling is sought and determine whether evidence exists in which a jury could find a verdict for that party. Therefore, a directed verdict must be denied when evidence exists upon which a jury could properly find a verdict for the nonmoving party. However, where the evidence is undisputed and the minds of reasonable persons may not draw differing inferences or arrive at opposing conclusions, the matter is a question of law for the trial court's

determination. *Brown v. United Methodist Homes for the Aged,* 249 Kan. 124, 126-27, 815 P.2d 72 (1991).

## Issue 1: Improper grant of directed verdict

While granting Coleman's motion for directed verdict, the court found that the undisputed evidence demonstrated that (1) FFT had breached the agreement when it sold trailers outside the authorized territory and did not comply with Coleman's approval process in its use of Coleman's trademarks, and (2) FFT had failed to cure these errors. We examine these two findings.

### Breach

FFT argues that triable issues of material fact remain regarding whether FFT's breaches were material to the agreement. Since the agreement did not define "cure," FFT alleges it cured the agreement when it ceased breaching the contract 30 days after receiving the written notice from Coleman. In FFT's opinion, whether it did so cease was a question of fact for the jury.

Paragraph 12.2 of the agreement states that Coleman may terminate the agreement if all three of the following events occur: (1) FFT must fail to perform or fulfill any term or obligation of the agreement; (2) Coleman must provide "written notice" to FFT of those defaults; and (3) after receipt of written notice, such default continues for 30 days.

Several facts about this are not disputed. Larry Marsh, general manager and vice president of FFT, testified that FFT received written notification that FFT had breached the sales territory and approval process provisions in the agreement. In response, on April 17, 2003, FFT instructed its production line to stop placing videotapes disapproved by Coleman in its trailers on May 10, 2003. Furthermore, on April 22, 2003, FFT admitted to Coleman that it had distributed its trailers outside the authorized territory but promised to fully comply "from this point forward." Contrary to that assertion, on May 7, 2003, FFT shipped 16 trailers to Norway, an unauthorized territory. As a result, on May 12, 2003, Coleman terminated the 2000 Trademark License Agreement, claiming that FFT

had failed to demonstrate that it had remedied the breaches that were cited in the written notice.

Fundamentally in their argument, FFT relies upon the district court's finding that paragraph 12.2 of the agreement requires a "material" breach to occur before Coleman may terminate the agreement. FFT argues that it did not materially breach the agreement because (1) its noncompliance with the territorial provision was a technical, not material, breach and (2) the evidence proved that FFT substantially complied with Coleman's approval process.

In contrast, Coleman challenges this ruling. Coleman argues that paragraph 12.2 does not require a breach to be material in order to trigger Coleman's option to terminate. Nonetheless, Coleman additionally argues that FFT's breaches were material to the agreement because those breaches threatened Coleman's ability to control its license, which was the essential purpose of the agreement.

We think the district court was incorrect here. The court interpreted the termination provision to *implicitly* require FFT's breaches to be material in order to terminate, while paragraph 12.2 does not include the word "material" in its language. But a separate paragraph of the agreement, paragraph 4.2, concerning royalties, specifies that FFT's failure to deliver the required royalty reports and payments shall constitute a *material breach*.

It has been said many times, the interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review. Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect. See *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001). When making such a determination, we take a large view:

"An interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners. The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided. [Citation omitted.]" *Johnson County Bank v. Ross*, 28 Kan. App. 2d 8, 10-11, 13 P.3d 351 (2000).

Moreover, where the language of the contract is clear and can be carried out as written, there is no room for construction or

modification of the terms. *Metropolitan Life Ins. Co. v. Strnad,* 255 Kan. 657, 671, 876 P.2d 1362 (1994).

Here, the language of paragraph 12.2 is clear and can be carried out as written. Paragraph 12.2 states that before Coleman has the option to terminate the contract, FFT must fail "to perform or fulfill any term or obligation" of the 2000 Trademark License Agreement. The term "any" means "one or some, regardless of sort, quantity, or number." Webster's II New College Dictionary 51 (1st ed. 1995). The parties' inclusion of "any" suggests that the provision breached may be one or more of the provisions in the agreement, not that the provision breached must be material to the agreement. As a result, the district court erred when it modified the phrase "any term or obligation" to include "material."

Going further, the uncontested evidence clearly demonstrates that FFT not only violated paragraph 2.2 of the agreement dealing with trade territory limits, but also paragraph 6.4 concerning Coleman's approval of materials. FFT conceded that it sold licensed products to countries outside the defined territory (found in paragraph 1.3). Furthermore, FFT admitted that its conduct was an oversight by "not keeping Coleman abreast of the new distribution points." Additionally, it is uncontested that FFT never requested Coleman's consent to sell to those countries. Therefore, it is undisputed that FFT breached paragraph 2.2(i) when it failed to limit its use of Coleman's trademarks to the territories specified in paragraph 1.3 and failed to amend the territory definition, as required under 2.2(ii), to include those additional countries.

Coleman's approval process is located in paragraph 6.4 of the agreement. It states that FFT must obtain Coleman's written approval by first submitting two samples of the product prior to the manufacture, sale, and distribution of its trailers or marketing materials. At issue is whether FFT failed to comply with the Coleman's approval process for FFT's trailers and FFT's marketing materials.

*Approval of Trailers*

Regarding FFT's trailers, Marsh testified that David Mitchell (the former head of Coleman's licensing department) verbally ap-

proved the Caravan trailer. After Mitchell's approval, Marsh stated that FFT created additional trailers that were not named Caravan, but the only difference between these trailers and the approved Caravan was the floor plan. Marsh testified that instead of numbering the models of the Caravan trailer, FFT personalized each model with a name. Therefore, Marsh believed it was unnecessary to obtain additional approvals since these trailers were all models of the Caravan. FFT additionally claimed that it believed providing Coleman access to visit its facility to view its trailers substituted for the requirement of shipping samples to Coleman.

On appeal, this court is required to resolve all facts and inferences reasonably drawn from the evidence in favor of FFT. Therefore, assuming that the other trailers used the same Caravan structure and that Coleman verbally approved of the Caravan trailer, a jury determination is necessary to determine if FFT complied with paragraph 6.4 for its trailers. We agree with FFT on this point, but this does not save FFT.

*Approval of Marketing Materials*

Coleman's approval of FFT's marketing materials is a different story. It is clear that FFT repeatedly violated Coleman's approval process under paragraph 6.4. In 2001, FFT requested approval for its 2002 folding trailer brochure. Specifically, FFT had created an anniversary logo, which included both Coleman's and FFT's trademarks. Eventually, Coleman approved FFT's brochure but denied FFT's request to use Coleman's trademarks in combination with FFT's anniversary logo. FFT's representatives admitted that it went ahead and published the brochure with the anniversary logo that included Coleman's trademarks.

Then, in 2002, FFT submitted two posters to Coleman that used the Coleman name improperly. Coleman advised FFT of its error and approved the posters so long as FFT made the requested changes. The record on appeal reveals that FFT did not make the requested changes and published the posters with the misuse of "Coleman."

In March 2003, Coleman notified FFT that the packaging for FFT's videotapes was using an "odd" Coleman parallelogram with-

out the standard lantern logo and provided FFT with Coleman's current logos. Nonetheless, FFT continued to place these improperly packaged videotapes into its trailers without updating the Coleman logo until May 10, 2003. Additionally, FFT failed to send a press release to Coleman for approval, which prompted Coleman to alert FFT of this error in January 2003.

Thus, the evidence FFT presented at trial undisputably showed that FFT failed to comply with paragraphs 2.2 and 6.4 of the agreement. There is simply no evidence on which the jury could have ruled in favor of FFT. The district court properly determined, as a matter of law, that FFT's actions constituted breaches under paragraph 12.2 of the agreement.

*Cure*

We turn now to the question of whether FFT cured its contract violations. If a contract default continued for 30 days after written notice, paragraph 12.2 allows Coleman to terminate the agreement. Therefore, on appeal, the parties contest whether FFT cured its violations sufficiently to prevent Coleman from terminating the license agreement.

Paragraph 12.2 of the agreement provides:

"12.2 Other Events of Termination. This Agreement may be terminated at COLEMAN'S option upon the occurrence of any of the following events; (i) [FFT] *fails to perform* or fulfill any term or obligation of this Agreement in the time and manner provided, and *if such default shall continue for thirty (30) days after written notice thereof.*" (Emphasis added.)

FFT disagrees with the district court's interpretation of paragraph 12.2. FFT thinks that provision only requires FFT to stop breaching the agreement *30 days after* it receives the written notice. Based on that interpretation, FFT argues that it was neither required to repair the past harm that had occurred from its breaches, nor was it required to stop breaching the agreement within that 30-day period. As a result, FFT alleges that triable issues of fact existed to warrant a jury determination on the matter. Opposing this, Coleman asks us to adopt the district court's definition of "cure," which is to remedy any existing breaches and

return the parties to their predefault conditions within the 30-day period.

Under its interpretation of paragraph 12.2, FFT cites *Anacapa Technology v. ADC Telecommunications*, 241 F. Supp. 2d 1016 (D. Minn. 2002), for support that it was not required to remedy any harm that stemmed from its breaches. In *Anacapa Technology*, Anacapa licensed its technology to ADC in exchange for royalties. ADC also agreed to protect Anacapa's confidential information. ADC then subcontracted the manufacturing of its licensed technology to a third party. When the third party began incorporating Anacapa's licensed technology into its own products, Anacapa notified ADC that it had materially breached the agreement by failing to ensure that its sublicensed third party treated as confidential the Anacapa confidential information identified in the Anacapa/ADC licensing agreement.

The issue before the *Anacapa Technology* court was the definition of cure in a noncommercial setting. Anacapa argued that to "cure a material breach under Minnesota law, [a licensee] must stop the offending conduct and repair the harm done by the breach." The court, however, decided that definition was in error, and held: "Instead, *cure requires substantial performance or performance without a material failure.*" (Emphasis added.) 241 F. Supp. 2d at 1020-21.

Using that interpretation, the court stated that the evidence showed that ADC undertook affirmative steps to cure its breach, such as obtaining an injunction against the third party to comply with the licensor's restrictions, requiring the third party through severe restrictions in the settlement agreement to treat as confidential Anacapa's confidential information, and mandating the third party to assign ADC ownership of the third party's patent that had incorporated Anacapa's technology. The district court also noted that ADC had implemented procedures to prevent the unauthorized disclosure of Anacapa's confidential information by securing audit rights over the third party and control over the third party's future development efforts. Because of ADC's efforts, the district court held that ADC had cured its breach. 241 F. Supp. 2d at 1025.

Even if we adopted this foreign definition of "cure," the trouble is, unlike ADC, FFT has failed to prove that it substantially performed under the agreement after it was notified of its breaches. *First*, FFT informed its product line to continue placing the videotapes with the disapproved packaging into its trailers until May 10, 2003, which would have been the day of termination. *Second*, after FFT represented to Coleman that it would "be in full compliance on [the territorial provision] from this point forward," 2 weeks later FFT breached that provision when it shipped its trailers to Norway. FFT's efforts simply fail to meet the level of substantial performance described in *Anacapa Technology*.

Furthermore, FFT misconstrues the purpose behind the 30-day remedial time period. The 30 days were not intended to give breaching parties an extended time period to commit new breaches. See 2 Farnsworth on Contracts §8.18, p. 525 (3d ed. 2004) ("Fairness ordinarily dictates that the party in breach be allowed a period of time — even if only a short one — to cure the breach if it can."). Therefore, analyzing the facts in this case under FFT's proposed cure definition, the undisputed evidence shows that FFT did not substantially perform the agreement once notified of its breaches. Accordingly, the district court was proper in determining, as a matter of law, that FFT failed to cure the breaches under paragraph 12.2.

### Issue 2: Improper jury instruction about profits

FFT claims that the jury's award of profits was misguided for three reasons. *First*, there was insufficient evidence to find that FFT's trademark infringement was willful. *Second*, if the jury determined FFT's infringement was willful, the court erroneously instructed the jury that it *must* award Coleman all of FFT's profits. *Third*, FFT asserts that the district court should have limited Coleman's receipt of FFT's profits to those profits attributable to the unlawful use of Coleman's trademarks and not all of FFT's profits. We analyze each point.

Two jury instructions that were given without objection must be considered here. Instruction No. 11 (profits award):

"If you find that [FFT]'s infringement of Coleman's trademark was willful (as defined in the following instructions) Coleman is entitled to any profits earned by [FFT] that are attributable to the infringement.

"Profit consists of all the gross revenue you believe that Coleman has proved that [FFT] received **less** all the expenses, including operating costs, overhead, and production costs, you believe [FFT] has proved that [FFT] incurred in selling those products."

Instruction No. 12 (definition of "willful"):

"You shall determine whether [FFT]'s use of Coleman's trademarks after May 12, 2003 was willful or bad faith. Willful or bad faith trademark infringement involves an intent to infringe or deliberate disregard of a trademark holder's rights.

"Trademark infringement is considered 'willful' where a party uses the trademark knowing it is not authorized to do so and knowing its use of the trademark is an infringement of the trademark holder's rights. 'Bad faith' is the continuing use of a mark knowing that it is wrongful."

Since FFT did not object to either instruction at trial, when reviewing this matter on appeal, we apply a clearly erroneous standard. See *Secretary of Kansas Dept. of Transportation v. Underwood Equipment, Inc.*, 273 Kan. 453, 455-56, 44 P.3d 439 (2002).

"An instruction is clearly erroneous if the reviewing court reaches a firm conviction that if the error had not occurred, there was a real possibility that the jury would have returned a different verdict. [Citation omitted.] If the instructions as a whole are substantially correct and the jury could not have been misled by them, the instructions will be approved on appeal. [Citation omitted.]" *Stover v. Superior Industries Int'l, Inc.*, 29 Kan. App. 2d 235, 242, 29 P.3d 967, *rev. denied* 270 Kan. 903 (2000).

For the definition of "wilfulness," both parties cite *Western Diversified Services v. Hyundai Motor America*, 427 F.3d 1269 (10th Cir. 2005), a decision issued after this jury trial was conducted. In *Western*, the Tenth Circuit Court of Appeals held that *"in the absence of actual damages, a plaintiff must ordinarily show that the defendant intended to benefit from the goodwill or reputation of the trademark holder"* in order to establish willfulness to obtain an award of profits. (Emphasis added.) 427 F.3d at 1273-74. The court noted that its standard was stricter than other circuits because the award of profits under the Lanham Act is an extraordinary remedy. The court also noted that "intent" required "something more than

'indifference' or a mere 'connection.' It is a conscious desire. [Citation omitted.]" 427 F.3d at 1274.

Prior to that decision, other courts have defined "willfulness" in this context as " 'conduct showing a "deliberate and intentional design to cause confusion and mistake to deceive purchasers." ' [Citations omitted.] 'It involves an intent to infringe or a deliberate disregard of a mark holder's rights.' [Citation omitted.] Bad faith is the continuing use of a mark knowing that it is wrongful. [Citation omitted.]" *First Savings Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1088 (D. Kan. 2000).

Instruction No. 12 repeats the same language found in *First Savings Bank,* only without the "deliberate and intentional design to cause confusion" clause. Therefore, because FFT did not deny that this law was accurate at the time the instruction was given, FFT's arguments will be analyzed under the "willfulness" definition used in *First Savings Bank, F.S.B.* We decline to follow *Western.*

It appears that FFT is alleging that the district court's omission of the "deliberate intent to cause confusion" language was erroneous and argues that had the district court provided that language to the jury, the evidence would have been insufficient to support such a finding by the jury.

To the contrary, the evidence supports a finding that FFT's conduct showed deliberate and intentional design to cause confusion in order to deceive FFT's dealers that were the purchasers of its trailers. *First,* although the July 11, 2003, order clearly stated that FFT was not entitled to continue to use Coleman's trademarks following Coleman's termination of the agreement, on July 17, 2003, FFT advised its dealers that the district court had *not* made any rulings about FFT's rights to Coleman's trademarks. *Second,* although FFT's reply letter stated that it was prepared to produce its travel trailers under FFT's brand, Marsh testified that FFT printed materials about the Caravan Microlite for the July and August 2003 dealer meetings that referred to the Microlite series as a Coleman product. Marsh admitted that FFT knew it did not have the right to put the Coleman brand on those trailers until it re-

ceived Coleman's permission and that FFT had never received such approval.

Therefore, even if the district court had inserted the "deliberate intent to cause confusion" language into Instruction No. 12, the evidence supported the jury's finding that FFT's infringement of Coleman's trademarks was willful.

FFT argues, as a matter of law, that the district court erred in instructing the jury that an award of profits automatically followed from a finding of willful trademark infringement, again citing *Western Diversified Services, Inc.*, which was *not* the law at the time of the trial. The Tenth Circuit noted that "[a]n award of profits in the absence of actual damages is usually predicated on one of two theories: (1) unjust enrichment; or (2) deterrence. [Citation omitted.]" 427 F.3d at 1272. Accordingly, the court stated that a finding of willfulness is necessary to support such an award. However, even with a finding of willfulness, a court may still exercise *its* discretion to reduce or even eliminate a profit award in the name of fashioning an equitable remedy to meet the needs of each case. Therefore, "an award of profits involves a two-step process: (1) a finding of willfulness or bad faith; and (2) a weighing of the equities." 427 F.3d at 1273.

FFT attempts to persuade us that the district court failed to provide that discretion to the jury in Instruction No. 11. But FFT fails to acknowledge the case law it cites. According to *Western Diversified Services, Inc.*, the " 'weighing [of] the equities' " is granted to the court, not the jury, to exercise its discretion to grant equitable relief. 427 F.3d at 1273. Furthermore, FFT cites *Estate of Bishop v. Equinox International Corp.*, 256 F.3d 1050, 1054-55 (10th Cir. 2001), *cert. denied* 534 U.S. 1130 (2002), which clearly states that such discretion to craft a remedy lies with the court:

"[W]e have never stated that a plaintiff must necessarily be so compensated whenever a defendant wrongfully appropriates the plaintiff's trademarked property to make a profit. [Citation omitted.] To the contrary, we have emphasized: 'An accounting of profits is not automatically granted upon a showing of infringement. Rather, the propriety of such relief is determined by equitable considerations. *Consequently, the district court has wide discretion to fashion an appropriate remedy.*' [Citations omitted.]" (Emphasis added.)

Therefore, FFT fails to prove that the district court's Instruction No. 11, which omitted any discretionary consideration, was in error. Besides, FFT received equitable relief as contemplated by *Estate of Bishop* when the court declined to impose any additional punitive damages against FFT.

Going further, we point out that Instruction No. 11 states that "[p]rofit consists of all the gross revenue you believe that Coleman has proved that Fleetwood received **less** all the expenses" incurred by Fleetwood in selling the products. From that instruction, FFT argues that the district court erred in failing to limit the profit award to the portion that directly resulted from its use of Coleman's trademarks. Nevertheless, since FFT informed the district court that the instruction was accurate, it is important to note that "[a] party may not invite error and then complain of that error on appeal. [Citation omitted.]" *Butler County R.W.D. No. 8 v. Yates*, 275 Kan. 291, 296, 64 P.3d 357 (2003).

In this case, the facts show that FFT pointed out this information to the jury. At trial, FFT's expert testified that FFT had an 11.8% margin loss due to the Coleman name, and thus, FFT's expert opined that the amount of FFT's profits attributable to Coleman's trademarks during the time period of infringement came to $118,570. Furthermore, during closing argument, FFT singled out Instruction No. 11 to the jury, reminding the jury that only approximately $118,000 of profit could be directly related to FFT's use of Coleman's trademarks.

General principles of law come into play here. "The courts find the accounting of profits remedy attractive and will accept its rough justice in competitive relationships because as between the victim and the wrongdoer, the burden is placed on the wrongdoer to prove, if it can, that some sales were not caused by the infringement." 5 McCarthy on Trademarks and Unfair Competition § 30:59, p. 30-136 (4th ed. 2007). Furthermore, "[u]nder the federal Lanham Act, as well as the common law, it is the infringer's burden to prove any proportion of his total profits, which may not have been due to use of the infringing mark." 5 McCarthy on Trademarks and Unfair Competition § 30:65, p. 30-157 (4th ed. 2007).

Therefore, even though FFT, the trademark infringer here, attempted to prove its proportion of total profits, it failed to meet its burden.

Since FFT has failed to show any error in the instructions or that there was a real possibility that the jury would have returned a different verdict, neither instruction was clearly erroneous.

## Issue 3: Erroneous exclusion of evidence about covenant not to compete

FFT argues that the district court erred in excluding evidence about the "Negative Covenant," claiming, "if the jury had understood that Coleman could not have used the trademark in the RV industry without FFT, and so the infringement actually caused a *benefit* to Coleman, that could have affected its deliberations." FFT alleges that by not understanding this critical fact, the jury awarded Coleman a windfall.

The parties are referring to a covenant not to compete in the original 1989 Stock Purchase Agreement between Fleetwood Enterprises, Inc. (FEI) and Coleman. In July 1989, Coleman created Coleman Recreational Vehicles, Inc., a Delaware corporation (hereafter referred to as CRVI). CRVI received all assets and liabilities of Coleman's recreational vehicle division. Then, Coleman transferred its capital stock in CRVI to Coleman Holdings, Inc. Thus, Coleman Holdings owned all of the outstanding stock of CRVI. Coleman Holdings then sold all of its capital stock in CRVI to FEI, a Delaware corporation, in December 1989. On December 7, 1989, the parties signed a contract they referred to as the 1989 Stock Purchase Agreement. After the sale, CRVI changed its name to FFT.

"[T]he admission of evidence lies within the sound discretion of the trial court. An appellate court's standard of review regarding a trial court's admission of evidence is abuse of discretion. [Citation omitted.] An abuse of discretion must be shown by the party attacking the evidentiary ruling, and 'exists only when no reasonable person would take the view adopted by the district court.' [Citation omitted.]" *Garrett v. Read*, 278 Kan. 662, 667, 102 P.3d 436 (2004).

After the district court severed FEI's and FFT's claims against Coleman, it granted Coleman's motion in limine to exclude references to paragraph 6.12 (Negative Covenant) of the 1989 Stock

Purchase Agreement (1) because the Negative Covenant was irrelevant to its lawsuit with FFT and (2) because FFT had no right to enforce the Negative Covenant since it was not a party to the 1989 Stock Purchase Agreement. The district court held that it was not going to preclude reference to the Negative Covenant prior to trial. But during the trial, the district court denied FFT's request to refer to the Negative Covenant in its opening statement. That does not mean FFT did not present evidence on this point.

In its cross-examination of Coleman's expert, FFT was allowed to mention the Negative Covenant's effect on the reasonable royalty rate that Coleman's expert proposed. In this testimony, FFT debated with the expert whether the $125 royalty rate from the Coleman/Coachmen RV contract established a fair market value since the Negative Covenant precluded a market place from existing:

"Q. [Counsel for FFT:] Mr. Wagner, you assumed that Coleman or found that Coleman could negotiate with another party for [$125] a trailer, correct?

"A. [Michael Wagner:] Correct.

"Q. And because they could do that you said that is a reasonable royalty, right?

"A. That's what I ended up concluding. Yes.

. . . .

"Q. Okay. If you — for whatever reason Coleman doesn't have the right to go out into the market and to negotiate with someone else and they can only negotiate with [FFT] — just assume that for a moment. Okay. That's going to change the price structure of what a reasonable royalty is under that set of circumstances, is it not?

"A. It does. Yes. I agree with that.

. . . .

"Q. *Mr. Wagner, don't you know Coleman has no right to go out and license anyone else other than [FFT]? Do you know that?*

"A. *I do know that.*

. . . .

"Q. Okay. I'm asking you, if you know, that they [Coleman] are not entitled to do that. Do you know that?

"A. I understand that based on the ruling of this court that's true.

"Q. All right. So, the premise or basis upon which that [$125] number was developed is no longer true today, is it, sir?

"A. I don't agree with that.

"Q. *They can't go license to that person, can they?*

"A. *Currently they cannot. No.*

"Q. And so they wouldn't be able to go enter into some negotiation with that person today to come to some licensing agreement?
"A. I think as of today they cannot do that. Yes." (Emphasis added.)

Christopher Pflaum, FFT's expert, also testified that Coleman was unable to license its trademarks to any company other than FFT, by stating, "I said that [$125] is an invalid point because it doesn't even meet the definition of market price because, in fact, the only person with whom Coleman can negotiate to put their name on recreational vehicles and receive a royalty is [FFT]."

Even though FFT was unable to present everything it wanted about the Negative Covenant to the jury in its opening statement, it is apparent that FFT was able to present information through Coleman's expert who confirmed that Coleman could not license its trademarks to any other company besides FFT. Accordingly, under these circumstances, the district court did not abuse its discretion in denying FFT's request to present the Negative Covenant in its opening statement.

Moreover, other than its opening statement, FFT did not further request permission from the district court to direct the jury's attention to the existence of the Negative Covenant. With that in mind, "[a] party may not invite error and then complain of that error on appeal. [Citation omitted.]" *Butler County R.W.D. No. 8,* 275 Kan. at 296. Therefore, FFT's argument on this point is unpersuasive.

### Issue 4: Lanham Act misinterpretation

FFT argues that its conduct did not constitute counterfeiting under the Lanham Act. It alleges that the district court erred in its interpretation of 15 U.S.C. § 1117(b) (2000), and, therefore, the court should not have tripled Coleman's award of damages and award Coleman attorney fees and costs.

The question of whether FFT's posttermination use of Coleman's trademarks constituted counterfeiting under the Lanham Act presents an issue of first impression in Kansas. The interpretation of the Lanham Act is a question of law over which appellate review is unlimited. *Scholfield Auto Plaza, L.L.C. v. Carganza, Inc.,* 26 Kan. App. 2d 104, 105, 979 P.2d 144 (1989). Under the Lanham Act, an owner of a trademark that is registered in the

Patent and Trademark Office may recover monetary remedies from any person who has violated its trademark. 15 U.S.C. § 1117 (2000). Violation of a trademark occurs when

"(1) Any person who shall, without the consent of the registrant —
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a) (2000).

When that use is a counterfeit of a mark, the Lanham Act further requires the court to treble profits or damages, whichever is greater, and award reasonable attorney fees.

"In assessing damages under subsection (a) of this section, [§ 1117,] the court *shall*, unless the court finds extenuating circumstances, *enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fees*, in the case of any violation of section 1114(1)(a) of this title or section 220506 of Title 36 *that consists of intentionally* using *a mark or designation, knowing such mark or designation is a counterfeit mark*, in connection with the sale, offering for sale, or distribution of goods or services." (Emphasis added.) 15 U.S.C. § 1117(b). (Section 220506 of Title 36 concerns trademarks related to the Olympics.)

### The Lanham Act defines a counterfeit mark to mean either

"(i) a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered; or
"(ii) a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of this chapter are made available by reason of section 220506 of Title 36." 15 U.S.C. § 1116(d)(1)(B) (2000).

### But, the definition of a counterfeit of a mark excludes

"any mark or designation used on or in connection with goods and services *of which the manufacture or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced,* by the holder of the right to use such mark or designation." (Emphasis added.) 15 U.S.C. § 1116(d)(1)(B).

A review of the facts is helpful here. It is undisputed that Coleman's trademark was registered with the United States Patent

and Trademark Office. Moreover, the district court determined that FFT's continued use of Coleman's trademark "in connection with its manufacture, distribution, and sale of recreational vehicle products after its authorization to do so ended" fell within the Lanham Act's definition of use of a counterfeit mark. The jury unanimously determined that FFT's posttermination use of Coleman's registered trademark was willful. As a result the district court held that FFT's trademark counterfeiting was intentional. FFT failed to prove that any extenuating circumstances existed. The district court then awarded Coleman three times the jury's profit determination, together with reasonable attorney fees and litigation expenses.

We first examine the language of the statute and provide our interpretation of its meaning. Next, we consider FFT's "dual branding" contention along with its claim of being a holdover manufacturer. Then we see if there are any extenuating circumstances that would excuse FFT's conduct.

Our rules concerning statutory interpretation are straightforward:

"It is a fundamental rule of statutory construction, to which all other rules are subordinate, that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. *When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be.* Stated another way, when a statute is plain and unambiguous, the appellate courts will not speculate as to the legislative intent behind it and will not read such a statute so as to add something not readily found in the statute." (Emphasis added.) *State ex rel. Graeber v. Marion County Landfill, Inc.*, 276 Kan. 328, Syl. ¶ 1, 76 P.3d 1000 (2003).

See also *Gragg v. Rhoney*, 20 Kan. App. 2d 123, 129-30, 884 P.2d 443 (1994), *rev. denied* 256 Kan. 994 (1995) (interpreting the Kansas statutes concerning service marks).

The language of 15 U.S.C. § 1117(b) is plain and unambiguous. The law clearly requires the district court to treble the profits award and award attorney fees if (1) the violator's conduct meets the definition of a counterfeit mark, (2) the violator intentionally used the mark knowing it was counterfeit, and (3) the court fails

to find extenuating circumstances that would justify the violator's use of that counterfeit mark.

Again, 15 U.S.C. § 1116(d)(1) describes a counterfeit of a mark as the use of a registered trademark in connection with goods sold, offered for sale, or distributed. Furthermore, to qualify as a counterfeit mark, the mark is not required to be identical as long as it is substantially indistinguishable from the genuine registered trademark. See Olson, *An Analysis of the Trademark Counterfeiting Act of 1984*, Practising Law Institute, Patents, Copyrights, Trademarks, & Literary Property Course Handbook, 198 PLI/Pat 9, 20 (1985) ("A mark need not be absolutely identical to a registered trademark in order to qualify as 'counterfeit,' since such an exacting standard would make it too easy to escape liability by introducing trivial variations." See Joint Explanatory Statement, [by Senate and House sponsors of final draft of bill,] Cong. Rec. H12078 [October 10, 1984]."). But a counterfeit mark does not exist in situations where the goods that contain the mark were manufactured or produced at a time when the user was authorized to use the mark. 15 U.S.C. § 1116(d)(1).

Here, FFT argues that its use of Coleman's trademark did not meet the counterfeit definition under 15 U.S.C. § 1116(d)(1)(B), claiming that its inclusion of "by Fleetwood" made its use of the Coleman's registered mark distinguishable. By combining its own name with Coleman's registered trademark, FFT alleges that its mark was not counterfeit within the meaning of the Lanham Act.

In response, Coleman contends that FFT failed to raise this dual branding argument to the district court. Generally, issues not raised before the district court may not be raised on appeal. *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 268, 62 P.3d 247 (2003). There are, however, several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including the following: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal, despite its reliance on the wrong ground for

its decision. *State v. Schroeder*, 279 Kan. 104, 116, 105 P.3d 1237 (2005).

FFT asserts that every FFT trailer included "by Fleetwood" as part of its mark. But, FFT cites only schedule A of the agreement for factual support. The record is not so clear on the point. For example, FFT provides the 2003 ½ brochure of the Coleman Caravan folding trailers. In the brochure, the recreational vehicle on the front cover does not have the "by Fleetwood" addition to Coleman's registered trademark. Furthermore, although one of the recreational vehicles within the brochure has the schedule A combined trademark, the other recreational vehicle has only "Coleman Caravan." Also, the brochure itself uses the Coleman registered trademark without the "by Fleetwood" addition.

At trial, Marsh testified that FFT placed the Coleman parallelogram with the folding trailer logo on trailers produced after the agreement was terminated. But, Marsh was not questioned whether "by Fleetwood" was included in the use of Coleman's registered trademark. Therefore, without more evidence to support FFT's argument, we cannot ascertain whether FFT's representation is valid. Accordingly, FFT has failed to prove that its use of Coleman's trademarks was distinguishable from Coleman's registered mark.

FFT next alleges that its advertising materials and trailers were developed during the time it was authorized to use Coleman's registered trademarks and therefore could never be considered as a counterfeit mark. This view is erroneous.

After Coleman terminated the agreement, Marsh testified that FFT continued to create advertising materials with Coleman's trademarks on them. FFT had developed the Highlander trailer, which was described as a product that blurred the distinction of folding trailers and travel trailers. This type of trailer was never submitted for Coleman's approval. Despite this, after the agreement was terminated, FFT continued to develop the Highlander product and produced 70 for sale with the Coleman brand. In the brochure FFT produced for the Highlander trailers, it advertised them as Coleman folding trailers. Furthermore, Kevin Ziance, FFT division controller, testified that (1) FFT produced approximately

3,000 folding trailers as FFT's 2004 models after May 12, 2003, and (2) in almost all of those trailers, Coleman's trademark would have been placed after May 12, 2003.

It is clear that the evidence demonstrates that FFT used Coleman's registered trademarks in connection with its recreational vehicles and that this use occurred after the agreement was terminated. Therefore, FFT's use meets the definition of a counterfeit mark under § 1116(d)(1)(B) of the Lanham Act.

FFT argues that it did not intentionally or knowingly violate Coleman's rights to its trademarks. It contends that it believed, in good faith, it had a lawful right to continue to use the marks. But the jury unanimously found that FFT's posttermination use of Coleman's registered trademarks was willful or in bad faith and that FFT did not prove that it reasonably relied upon competent legal advice when deciding to engage in trademark infringement. FFT did not challenge this aspect of the jury's verdict. We rely upon the jury's findings and hold that FFT intentionally used Coleman's registered trademarks knowing that its use was counterfeit.

Although the Lanham Act does not define "extenuating circumstances," the exception is extremely narrow. *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1314 (9th Cir. 1997); *Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 588 (7th Cir. 1989).

"What constitutes an extenuating circumstance is determined on a case by case basis. Where the defendant is an 'unsophisticated individual, operating on a small scale, for whom the imposition of treble damages would mean that he or she would be unable to support his or her family' treble damages may be inappropriate. Joint Explanatory Statement, 130 Cong. Rec. H. 12,076 at 12,083 (Oct. 10, 1984). However, Congress has indicated that 'it will be a rare case in which a defendant who has trafficked in goods or services using a mark that he or she knows to be counterfeit that he or she should not be assessed treble damages.' [Citation omitted.]" *Microsoft Corp. v. CMOS Technologies, Inc.*, 872 F. Supp. 1329, 1339 (D. N.J. 1994.)

As an extenuating circumstance, FFT alleges that its status as a "holdover licensee" means that it was not a counterfeiter. FFT relies upon *U.S. Structures, Inc., v. J.P. Structures, Inc.*, 130 F.3d 1185, 1192 (6th Cir. 1997), and *Motor City Bagels, L.L.C. v. American Bagel Co.*, 50 F. Supp. 2d 460, 489 (D. Md. 1999), for support.

In *U.S. Structures,* the franchisor signed a franchise agreement with a franchisee. For 6 years, there were no problems until the franchisee failed to make payments of its sales royalties. Because of that breach, the franchisor notified franchisee that it would terminate the agreement unless the franchisee made the payments within 20 days, which did not occur. The franchisor then terminated the agreement.

After the agreement was terminated, the franchisee continued to use the franchisor's trademark while the parties attempted to settle their dispute. Additionally, the franchisee did not terminate its participation in an advertising program which used the franchisor's trademark that it had entered before the agreement was canceled. As a result, the franchisor sued franchisee for violating the Lanham Act.

The court granted summary judgment to the franchisor, holding that the franchisor was entitled to relief as a matter of law for trademark infringement in violation of 15 U.S.C. § 1114. Accordingly, the district court awarded damages to the franchisor, which included franchisee's profits that were trebled, and franchisor's attorney fees because franchisee's infringement was "willful, deliberate, and intentional." See 130 F.3d at 1188. Franchisee appealed.

The Sixth Circuit Court of Appeals evaluated the trebling of damages and attorney fees award separately. First, the court noted that the district court made its ruling for tripling the damage amount under both 15 U.S.C. § 1117(a) and (b). Therefore, since § 1117(a) vested the district court with discretion to increase the damages award, the Sixth Circuit held that the district court's finding was not in error. It was, in its view, a valid exercise of discretion. 130 F.3d at 1191-92.

The court then examined the district court's award of attorney fees under § 1117(b), the section operable here. The court cited the statutory provisions of the Lanham Act that involved the use of a counterfeit mark and, without further analysis, held the following:

"We agree with defendants that § 1117(b) does not apply where, as in this case, a holdover franchisee continues to use the franchisor's original trademark after the franchise has been terminated. Although the use of an original trademark is

without authorization, it is not the use of a counterfeit mark. Thus, the district court erred in awarding attorneys' fees pursuant to § 1117(b)." 130 F.3d at 1192.

The court remanded the attorney fees issue to the district court to determine whether § 1117(a) warranted these fees to be awarded to the prevailing party. The court stated: "Unlike § 1117(b), which mandates an award of attorneys' fees unless the court finds extenuating circumstances, § 1117(a) makes attorneys' fees available only in exceptional cases and rests the decision to award them in the discretion of the district court. [Citation omitted.]" 130 F.3d at 1192.

In *Motor City Bagels,* terminated fast food restaurant franchisees sued the franchisor for a breach of contract claim. In response, the franchisor counterclaimed, alleging that the franchisees' continued use of its service marks after termination of the franchise agreements constituted service mark infringement and unfair competition. The franchisees used the franchisor's marks on their outside restaurant signs and in their register receipts.

The district court relied upon *U.S. Structures* for its finding and denied the franchisor's motion for damages and attorney fees under 15 U.S.C. § 1117(b). *Motor City Bagels,* 50 F. Supp. 2d at 489. The court found that the franchisor presented significant evidence to sustain its trademark infringement claim. But the court was persuaded by the fact that the franchisees undertook significant measures to change the identity of their restaurants after the agreement was terminated. Furthermore, the district court pointed out that the local zoning regulations precluded the franchisees from removing their exterior signs unless they were immediately replaced with other city-approved signs and that the replacement of the cash register receipts proved to be a technological challenge which took time to reconcile. 50 F. Supp. 2d at 487.

Although the *U.S. Structures* court held that a holdover franchisee was not a counterfeiter under § 1117 (b), in actuality that court determined that the district court's award for such trademark infringement was more appropriate under § 1117 (a). Therefore, even though this case's facts are similar to *U.S. Structures,* we rely on the *Motor City Bagels* analysis that follows the *U.S. Structures*

analysis but also pointed out that the franchisees' conduct in changing identification with the franchisor must be taken into consideration.

In this case, FFT alleges that it made significant efforts to change its identification with Coleman. The facts, however, show that these measures occurred too late. *First,* FFT notified the dealers of the pending litigation over the license on July 17, 2003, but asserted that it would continue "business as usual" until the matter was resolved. FFT finally notified the dealers that it could not use Coleman's trademarks after the district court issued the temporary injunction in August 2003. *Second,* although FFT requested on August 7, 2003, that the Coleman logo be removed from the Highlander trailers, up until then, FFT sold approximately 3,000 recreational vehicles branded with the Coleman name that were produced after May 12, 2003.

Therefore, unlike the situation in *Motor City Bagels,* FFT had the opportunity to split from Coleman but chose to take such measures in an *untimely* manner. Furthermore, FFT's mere status as a holdover licensee is not an extenuating circumstance sufficient to avoid a finding of counterfeiting. We agree with the district court that there were no extenuating circumstances here that would preclude the application of 15 U.S.C. § 1117(b).

Because all the elements under § 1117(b) were met, the district court did not err in trebling the profits award, instead of awarding royalties, and did not err in awarding attorney fees to Coleman.

### Issue 5: No need for punitive damage instruction

Our court has previously determined the fourfold purpose of the Lanham Act is (1) to secure to the owner of the mark the goodwill of a business use, (2) to protect the ability of consumers to distinguish among competing producers, (3) to make actionable the deceptive and misleading use of marks, and (4) to protect persons engaged in commerce against unfair competition. *Scholfield Auto Plaza, L.L.C. v. Carganza, Inc.*, 26 Kan. App. 2d 104, Syl. ¶ 4, 979 P.2d 144 (1989).

Similarly, Kansas courts have also determined that punitive damages serve two public purposes—punishment and deterrence.

*Hartford Accident & Indem. Co. v. American Red Ball Transit Co.*, 262 Kan. 570, 574-75, 938 P.2d 1281, *cert. denied* 522 U.S. 951 (1997); *Golconda Screw, Inc. v. West Bottoms Ltd.*, 20 Kan. App. 2d 1002, 1007, 894 P.2d 260 (1995) (" 'In Kansas, punitive damages are awarded to punish the wrongdoer for his malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs.' ").

The purposes behind the Lanham Act are similar to the purposes for punitive damages. Since the enhanced award under the Lanham Act was granted and is upheld in this appeal, it is not necessary to further punish FFT with punitive damages. Therefore, the district court was correct in declining to enter the jury's award for punitive damages in addition to the award ordered under the Lanham Act.

Affirmed.